**EXHIBIT "A"**

# LEASE AGREEMENT

This Lease Agreement ("Lease") is entered into as of the date set forth in Section 1.1 by and between Landlord and Tenant.

## ARTICLE 1- BASIC LEASE PROVISIONS

1.1      Effective Date: ___07/17/2009_____.

1.2      Landlord: PAX AMERICA DEVELOPMENT, LLC, a California limited liability company.

1.3      Tenant:      HAWKEYE ENTERTAINMENT, LLC, a California Limited Liability Company.

1.4      Tenant's Trade Name: _____ (Article 9)

1.5      Premises: 618 S. Spring Street, 1st, 2nd, 3rd and 4th floors (existing nightclub space), Los Angeles, California 90004. (Article 2)

1.6      Floor Area of Premises: Approximately Twenty-Three Thousand (23,000) square feet which has been agreed upon as the usable square footage by the parties based upon architectural drawings, and shall be deemed conclusive for the purposes of this lease agreement and any subsequent assignments, extensions, options, or modifications. (Article 2)

1.7      Total Building Area: Approximately Seventy Thousand (70,000) square feet. (Article 2)

1.8      Tenant's Share of Common Area Costs: Thirty Percent (30%). (Article 11)

1.9      Tenant's Share of Property Taxes: Thirty Percent (30%) of the entire property taxes assessed on the Building payable every six (6) months. (Article 7)

1.10      Initial Term: Ten (10) Lease Years commencing on the Rent Commencement Date (as defined below). "Lease Year" as used herein means each of the consecutive twelve (12) calendar month periods during the Term beginning on the first day of the calendar month in which the Rent Commencement Date occurs, except that, if the Rent Commencement Date occurs on a day other than the first day of the month, the first Lease Year shall be deemed to be the first twelve (12) full calendar months after the Rent Commencement Date and the number of days occurring between the Rent Commencement Date and the first full calendar month thereafter. (Section 3.1)

1.11      Intentionally Deleted.

1.12      Rent Abatement: Minimum Rent shall be abated for the nine (9) full calendar months after the Rent Commencement Date.

1.13      Rent Commencement Date: The earlier of (i) Tenant's grand opening in the Premises, or (ii) the date on which all of the following has occurred: (a) Tenant has obtained the CUP (as defined in Section 5.3) and ABC License (as defined in Section 5.3) and sign off by LADBS, (b) Tenant has completed Tenant's Work, and (c) there exists no outstanding order against Landlord or the Building from

any governmental or administrative agency preventing or materially interfering with Tenant's ability to conduct the Permitted Use in the Premises. (Article 3)

1.14    Minimum Rent: Minimum Rent shall be payable monthly in the amount of $27,500.00. Minimum Rent shall increase as of the commencement of each Lease Year ("Adjustment Date") determined by multiplying $27,500 by a fraction, the numerator of which is the CPI (as defined in Section 22.11(c)) published three (3) months before the Adjustment Date and the denominator of which is the CPI published three (3) months before the Rent Commencement Date; provided, however, that in no event shall the Minimum Rent for any Lease Year exceed the Minimum Rent for the prior Lease Year by more than three percent (3%). (Article 6)

1.15    Percentage Rent: None.

1.16    Radius Restriction Area: None.

1.17    Use of Premises: The Premises shall be used solely for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use (collectively, the "Permitted Use"). The Premises may not be used for any other purpose without the Landlord's prior written consent. (Article 9)

1.18    Insurance Limits: Not less than Two Million Dollars ($2,000,000.00) in single limit coverage per occurrence with an annual aggregate of not less than Four Million Dollars ($4,000,000.00) for bodily injury, personal injury, death and property damage liability with liquor liability and assault and battery coverage endorsements. (Article 13)

1.19    Security Deposit: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00). (Section 22.2)

1.20    Guarantor(s): _____, an individual.

1.21    Broker(s): None.

1.22    Notices (Article 21):

To Landlord:                                        To Tenant:

PAX AMERICA DEVELOPMENT, LLC          HAWKEYE ENTERTAINMENT, LLC
2333 Beverly Blvd.                                  1242 Ventura Blvd. #212
Los Angeles, California 90057                 Sherman Oaks, California 91423

Attn: Kevin K Choe                                 Attn: _____

1.23    Options: Two (2) terms of Five (5) Lease Years each. (Section 3.2)

1.24    Prepaid Rent: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00) applicable to Minimum Rent due for the first calendar month commencing after expiration of the Rent Abatement Period (as defined in Section 6.2).

1.25    Tenant Improvement Allowance: Five Hundred Forty Thousand Dollars ($540,000.00). (Article 5)

If there is any conflict between any provisions contained in this Article 1 and the balance of this Lease, the provisions of this Article 1 shall control.

## ARTICLE 2- PREMISES

2.1    Premises. Landlord leases to Tenant and Tenant leases from Landlord, for the "Term" (as defined in Article 3) and upon the covenants and conditions set forth in this Lease, the premises described in Section 1.5 ("Premises") and depicted on the Site Plan as the 1st through 4th floors of the Building, which Site Plan is attached hereto as Exhibit A and incorporated herein by reference. "Building" as used herein means the structure constructed in which the Premises is located pursuant to the terms hereof. Notwithstanding anything contained in this Lease to the contrary, the Premises shall be deemed to include the airspace within and the interior surfaces of the fixed ceiling, slab and exterior walls. The Premises does not include the roof, floor slab or foundations, or the structural or exterior walls which are immediately adjacent to the Premises. Tenant shall have the non-exclusive right to use the Common Area of the 1st Floor of the Building as provided in this Lease. Tenant shall also have the non-exclusive right to place equipment on the roof of the Building.

2.2    Reservation. Landlord reserves the right to use the exterior walls, roof and plenum in, above and below the Premises for the repair, maintenance, use and replacement of pipes, ducts, utility lines and systems, structural elements serving the Building and for such other purposes related to the maintenance of the Building as Landlord reasonably deems necessary. In exercising its rights reserved herein, Landlord shall not unreasonably interfere with the operation of Tenant's business on the Premises and shall, to the extent possible, limit the exercise of the foregoing right to such times as the business in the Premises is not open to the public.

2.3    Floor Area. The term "Floor Area," as used in this Lease, shall mean all areas designated by Landlord for the exclusive use of a tenant measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Premises shall be deemed to contain the number of square feet of Floor Area specified in Section 1.6 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Premises and verify the actual Floor Area thereof. Even in the event the Floor Area of the Premises is determined by Landlord to be more or less than the Floor Area as specified in Section 1.6 of this Lease, the Minimum Rent and Additional Rent (as hereinafter defined) including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8, Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly.

2.4    Building Area. The term "Building Area," as used in this Lease shall mean all areas of the Building where the demised Premises are located including, but not limited to, the demised Premises, other rentable areas in the Building and areas within the Building designated as Common Areas for use by any and all tenants in the Building measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Building shall be deemed to contain the number of square feet of Total Building Area specified in Section 1.7 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Total Building Area and verify the actual floor area thereof. Even in the event the Total Building Area is determined by Landlord to be more or less than the Total Building Area as specified in Section 1.7 of this Lease, the Minimum Rent and Additional Rent, including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8,

Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly. Execution of this Lease by Tenant shall deem the Tenant's unequivocal acceptance of the Total Building Area as specified in this Lease.

2.5    Parking. Tenant acknowledges and agrees that this Lease does not include grant of parking spaces for Tenant of Tenant's patrons within the Building. Tenant shall be solely responsible to procure required parking spaces for the operation of Tenant's business during the term of this Lease.

2.6    Common Area Usage. Tenant shall have the non-exclusive right without additional payment to Landlord, and in common with all other tenants in the Building, to use the Common Area located on the exterior of the Building and the Common Area located on the first floor of the Building ("First Floor Common Area") identified by hatched mark in Exhibit A attached hereto and incorporated herein by reference. In addition, without additional payment to Landlord, the portion of the First Floor Common Area immediately left from the main entrance to the Building identified as the "Waiting Area" in Exhibit A is hereby designated as an area to be exclusively used by Tenant and its invitees, only during the Term, as Tenant's patrons' waiting area. None of the foregoing designated Common Areas shall be used by Tenant for any activity which generates any revenue in the said Common Area without the Landlord's prior written consent.

## ARTICLE 3- TERM

3.1    Term. This Lease shall be effective from and after the Effective Date specified in Section 1.1. It is expressly acknowledged and agreed by the parties that this Lease and the terms and provisions hereof are binding in all respects when executed and delivered by the parties, notwithstanding that the Term does not commence and certain obligations, including the obligation to pay Minimum Rent, do not accrue until a later time as expressly provided elsewhere in this Lease. The initial term of this Lease ("Initial Term") shall commence on the Rent Commencement Date (as specified in Section 1.13). The Initial Term shall continue, unless sooner terminated in accordance with the provisions of this Lease, for the number of Lease Years specified in Section 1.10 from the Rent Commencement Date. Within ten (10) days after either party's request, the parties shall execute a certificate substantially in the form of Exhibit C attached hereto evidencing the Rent Commencement Date of this Lease. Notwithstanding anything in this Lease to the contrary, in the event Tenant elects, in its sole discretion, to open for business in the Premises prior to the satisfaction of all of the requirements of clause (ii) of Section 1.13, then the cost incurred by Tenant to comply with any special conditions imposed by any governmental agency due to any uncompleted highrise retrofit work set forth in Section 5.8 below, shall be Landlord's responsibility and Landlord shall reimburse Tenant for such cost within thirty (30) days after receipt of demand therefor and, in the event that Landlord fails to timely reimburse Tenant for such cost, Tenant shall be permitted to deduct such amount from Minimum Rent and Additional Rent next coming due under this Lease.

3.2    Options. Landlord grants to Tenant the options ("Option(s)") of extending the Initial Term for two (2) periods of five (5) Lease Years each (each such period is herein referred to as the "Extension Period" and collectively as the "Extension Periods") pursuant to the terms set forth herein. With respect to each Extension Period, Tenant may exercise the Option by giving Landlord written notice ("Option Notice") of Tenant's irrevocable exercise of the Option at least six (6) months in advance of the prospective Extension Period. If Tenant fails to timely provide any Option Notice to Landlord, such failure shall not in and of itself cause Tenant to forfeit its right to exercise the Option respecting the applicable Extension Period and, in such event, Tenant shall have thirty (30) days after receipt of written notice from Landlord of Tenant's failure to timely exercise the Option to deliver the Option Notice. If Tenant does not deliver the Option Notice to Landlord within said 30-day period, then Tenant's rights to the applicable Extension Period, as well as any subsequent Extension Period, shall terminate. Any Option shall immediately and automatically terminate and shall be of no further force or effect in the event that

this Lease is terminated in accordance with the terms and provisions of this Lease. As used in this Lease, "Term" means the Initial Term plus any Extension Period(s) the Option(s) for which is (are) exercised by Tenant pursuant to this Section 3.2.

## ARTICLE 4- POSSESSION

4.1     Turnover Date. The term "Turnover Date", as used in this Lease, shall mean the Effective Date. The Premises shall be available for Tenant's contractor to commence construction of "Tenant's Work" (as specified in Exhibit D) on the Turnover Date.

4.2     Delivery of Possession. Landlord shall deliver and Tenant shall accept possession of the Premises from Landlord upon the Turnover Date; provided, however, Tenant shall have no right to enter into possession of the Premises until Tenant has delivered copies of policies of insurance or certificates thereof (as required under Article 13). In addition Tenant shall not commence any of Tenant's Work until the following requirements have been satisfied: (a) "Final Approved Plans" (as defined in Exhibit D) have been approved by Landlord pursuant to Exhibit D; (b) Tenant has delivered to Landlord a copy of Tenant's building permit, if issued by such date, and (c) Tenant has caused to be transferred to its name (and delivered written confirmation thereof to Landlord to the extent reasonably obtainable by Tenant from each applicable utility company) the utilities needed for Tenant to operate from the Premises from Landlord to Tenant. Tenant shall pay the Security Deposit (as specified in Section 1.19) and Prepaid Rent (as specified in Section 1.24) to Landlord on the date Tenant signs this Lease. Tenant agrees to accept possession of the Premises on the Turnover Date in its present "AS IS," "WHERE-IS" and "WITH ALL FAULTS" condition provided that the roof shall be in water-tight condition, and shall, subject to the terms and conditions of this Lease, hold Landlord harmless from any liability or claims relating to the condition of the Premises.

4.3     Landlord's Tender of Possession AS-IS. Tenant acknowledges that Tenant has had sufficient opportunity to inspect the Premises prior to execution this Lease. Tenant agrees, subject to Landlord's obligations under Sections 5.7, 9.5 and 10.1 and Exhibit D, to accept possession of the Premises on the Effective Date in its present condition "AS IS," "WHERE-IS" and "WITH-ALL-FAULTS."

4.4     Landlord Disclosures.    Tenant expressly acknowledges that Tenant has been made fully aware of the necessity for the Building in which the Premises are located to comply with the L.A. City High Rise Retrofit requirements respecting fire safety standards. Landlord has apprised Tenant of the *current requirements as set forth by LADBS in its notice* of violation dated December 10, 2006 stating that the Building is not up to current High Rise Retrofit standards. As a portion of this notice, Landlord has disclosed to Tenant the necessity for Fire Department approval of the compliance work. Landlord represents and warrants that no other notices of additional noncompliance or violations exist to Landlord's knowledge as of the Effective Date.

## ARTICLE 5- TENANT'S CONSTRUCTION~ TENANT CONSTRUCTION ALLOWANCE

5.1     Tenant's Construction. Tenant shall commence construction of Tenant's Work, if any, upon Landlord's delivery of possession of the Premises to Tenant, subject to the requirements of Section 4.2, and shall diligently prosecute same to completion. Tenant shall deliver to Landlord a copy of the certificate of occupancy for the Premises issued by the appropriate governmental agency upon completion of Tenant's Work.

5.2    Tenant Improvement Allowance. Landlord shall, concurrently with the execution of this Lease, pay to Tenant the sum of FIVE HUNDRED FORTY THOUSAND DOLLARS ($540,000.00) as a Tenant Improvement Allowance. Tenant shall be permitted to use and apply the Tenant Improvement Allowance in any manner it elects.

5.3    Tenant Improvement Work. Tenant shall be solely responsible for performing or causing to be performed any and all tenant improvement work required by Tenant to be performed in the Premises in order to operate the Permitted Use, including, but not limited to, the procurement of a Conditional Use Permit ("CUP") from the appropriate governmental agencies for the use of the Premises as a nightclub and/or restaurant, and the procurement of the required ABC license ("ABC License") from the appropriate governmental agencies. Any proposed tenant improvement work must be pre-approved by Landlord in writing pursuant to Exhibit D, but approval of the same by Landlord shall not be unreasonably withheld.

5.4    Rights to CUP. The entire rights under the CUP shall belong to Landlord following the expiration of the Term or earlier termination of this Lease.

5.5    Tenant Improvement Work in the First Floor Common Area. Tenant shall be required, as a part of Tenant's Work, to remodel the First Floor Common Area including the main corridor and the bathrooms located on the first floor of the Building. Tenant shall complete the remodeling of the First Floor Common Area subject to the Landlord's prior approval of the plans therefore in accordance with Exhibit D. The workmanship and the materials utilized in the remodel of the first floor Common Area by Tenant shall be first-class and Tenant shall perform or cause such remodel to be performed at Tenant's sole expense (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance).

5.6    Repair and Operation of Elevators. Tenant expressly acknowledges that the elevators in the Building are inoperative as of the Effective Date. As a part of consideration for Landlord to enter into this Lease and as a part of Tenant's work, Tenant agrees to repair and remodel one of elevators in the Building at Tenant's sole cost (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance) and Tenant shall maintain such elevator during the term of this Lease to the extent such elevator is necessary for the procurement of the CUP and to comply with the laws applicable to the operation of Tenant's business in the Premises. Such repair and maintenance shall be completed by Tenant through a contractor approved by Landlord and the quality of any remodeling work on the elevator so repaired and put back in operation by Tenant shall require the Landlord's prior written consent. In the event that future tenants occupy any portion of the Building, then such elevator maintenance obligation shall be assumed by Landlord as a part of Common Area Costs. Notwithstanding anything in this Lease to the contrary, so long as Tenant is responsible for the maintenance of one of the elevators as provided herein, Common Area Costs shall not include any cost incurred by Landlord in connection with maintenance of the elevators in the Building.

5.7    Installation and Maintenance of HVAC. Tenant shall be solely responsible for maintaining, replacing or upgrading the HVAC system for the Premises during the Term of this Lease as provided under Tenant's Maintenance Obligations as set forth in Section 10.3 of this Lease.

5.8    High Rise Retrofit. As a part of Tenant's Work, Tenant will complete the required construction to effect completion of the Los Angeles City High Rise Retrofit requirements for the Building as per the requirements set forth in the December 10, 2006 LADBS notice of noncompliance ("Required Retrofit Work"). The construction expenses, including all architectural, engineering,

inspection and permit fees for the Required Retrofit Work will be borne by Landlord and paid to Tenant according to Exhibit D.

## ARTICLE 6- RENTAL

6.1     Minimum Rent. Tenant shall pay the sum specified in Section 1.14 ("Minimum Rent") in advance, on or before the first (1st) day of each month, without prior demand and without offset or deduction (except as expressly and specifically provided in this Lease), commencing on the Rent Commencement Date. Should the Rent Commencement Date be a day other than the first (1st) day of a calendar month, then the Minimum Rent for the first partial month shall be prorated based on the actual number of days in such calendar month.

6.2     Rent Abatement. Notwithstanding anything in this Lease to the contrary, Minimum Rent shall be abated (i.e., Tenant shall have no obligation to pay Minimum Rent) for the nine (9) full calendar months after the Rent Commencement Date plus, if the Rent Commencement Date occurs on a day other than the first day of the month, the period between the Rent Commencement Date and the first full calendar month thereafter (collectively, "Rent Abatement Period"). In no event shall the Term of this Lease be extended by the Rent Abatement Period. The abatement of Minimum Rent during the Rent Abatement Period shall not effect Tenant's obligation to pay Additional Rent during the Rent Abatement Period.

6.3     Percentage Rent; Gross Sales Reports. Tenant shall not be required to pay Percentage Rent or to provide reports respecting sales from the Premises.

6.4     Additional Rent. Tenant shall pay, as "Additional Rent", all sums required to be paid by Tenant to Landlord pursuant to this Lease in addition to Minimum Rent. Landlord shall have the same rights and remedies for the nonpayment of Additional Rent as it has with respect to the nonpayment of Minimum Rent. It is the intention of Landlord and Tenant that the Minimum Rent and Additional Rent to be paid hereunder shall be paid to Landlord without deduction of any amount or any nature whatsoever, except as otherwise expressly and specifically provided in this Lease.

6.5     Place of Payment. Tenant shall pay Minimum Rent and Additional Rent to Landlord at the address specified in Section 1.22, or to such other address and/or person as Landlord may from time to time designate in writing to Tenant.

6.6     Late Payments. If Tenant fails, within five (5) business days after Tenant's receipt of written notice from Landlord that same is past due and unpaid, to pay any Minimum Rent or Additional Rent, the unpaid amounts shall bear interest at the Interest Rate, as defined in Section 22.11(m), from the date the unpaid amount was initially due, to and including the date of payment. In addition, if any Minimum Rent or Additional Rent is not received by Landlord from Tenant within five (5) business days after Tenant's receipt of written notice that such payment is past due and unpaid, Landlord may impose a late charge equal to four percent (4%) of the delinquent amount. Landlord and Tenant agree that this late charge represents a reasonable estimate of the costs and expenses Landlord will incur and is fair compensation to Landlord for its loss suffered by reason of late payment by Tenant. Acceptance of a late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law or in equity. If Tenant fails in three (3) consecutive months in any calendar year to make rental payments when due date, or if checks are returned due to insufficient funds three (3) consecutive times during the Lease Term. Landlord, in order to reduce its administrative costs may require, by giving written notice to Tenant (and in addition to the late charge stated herein, as well as any other rights and

remedies accruing under this Lease, or any other term, provision or covenant of this Lease at law or in equity) that Minimum Rent is to be paid quarterly in advance instead of monthly and that all future rental payments are to be made on or before the due date by cash, cashier's check or money order, and that the delivery of Tenant's personal or corporate check will no longer constitute a payment of Rent as provided in this Lease

ARTICLE 7- TAXES

7.1     Real Property Taxes.

(a)     As used in this Lease, the term "Taxes" shall include any form of tax or assessment, license fee, license tax, use tax, possessory interest tax, tax or excise on rental, or any other levy, charge, expense or imposition imposed by any Federal, state, county or city authority having jurisdiction, or any political subdivision thereof, or any school, agricultural, lighting, drainage or other improvement or special assessment district, special improvement district or local improvement district on the interest of Landlord in the Building and the underlying realty. Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of Taxes, in addition to and together with any and all rental otherwise payable hereunder. Notwithstanding anything in this Lease to the contrary, Tenant shall have no obligation to reimburse Landlord for and Taxes shall not include (i) any penalties or late fees resulting from Landlord's failure to pay Taxes prior to delinquency, (ii) the increased amount of any Taxes if such are not paid by the date required to take advantage of any discount offered by the taxing authority, (iii) any fees, assessments or other charges (such as sewer, storm drain or street work charges, parkland or road dedication fees, frontage or other development fees) levied by governmental agencies as a condition of or in connection with the initial development or redevelopment of the Building, (iv) any costs for on site or off site infrastructure or capital improvements in connection with the initial development, redevelopment or acquisition of the Building, (v) any income, business, personal property, franchise, inheritance, gift, succession or transfer taxes imposed on Landlord by any governmental authority, or (vi) any increase in Taxes resulting from a change of ownership in the Building or underlying realty.

(b)     Landlord shall pay all Taxes levied against the Building and underlying realty prior to delinquency. From and after the Rent Commencement Date, Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of Taxes assessed against the Building and underlying realty for each full or partial fiscal tax year during the Term pursuant to Section 7.1(c) below. Landlord shall deliver to Tenant a copy of each tax bill covering the Building and underlying realty on Landlord's receipt of the same, together with Landlord's calculation of Tenant's Share of Taxes. Tenant shall pay Landlord Tenant's Share of Taxes respecting said tax bill within thirty (30) days after Tenant's receipt of said tax bill, or thirty (30) days prior to delinquency, whichever is later. If the taxing authority permits payment to be made in installments without an increase or penalty, Tenant's obligation to reimburse Landlord for Taxes under this Section 7.1 shall be limited to Tenant's Share of such installment payments. Tenant's payment shall be proportionately reduced for periods of the Term of less than a full fiscal tax year.

(c)     For the purposes of this Lease, "Tenant's Share of Taxes" shall be deemed to be Thirty Three Percent (33%) of the Taxes on the Building and underlying realty.

7.2     Other Property Taxes. Tenant shall pay, prior to delinquency, all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, trade fixtures, merchandise and other personal property in, on or upon the Premises.

7.3     Contesting Taxes. If Landlord elects to contest (either formally or informally through negotiations) any Taxes levied or assessed against the Building during the Term, Tenant shall not be required to pay any portion of the costs or expenses incurred by Landlord in connection with such contest. However, if Landlord is successful in such contest (whether by settlement or otherwise), Landlord may deduct from the portion of any refund received which is payable to Tenant, Tenant's proportionate share of the costs and expenses incurred by Landlord in connection with such contest, determined pursuant to the formula set forth in Section 7.1(c) for the allocation of Taxes. Landlord shall pay to Tenant that portion of the total refund remaining, if any, which is attributable to Tenant's Share of Taxes prorated in the same manner as set forth in Section 7.1(c).  Tenant may, at its own expense, initiate proceedings to contest any Taxes assessed against the Building or underlying realty on Landlord's behalf.  If Tenant is successful in such contest, any refund shall first be used to reimburse Tenant for its reasonable expenses incurred in connection with the tax contest.  The balance, if any, shall be apportioned between Landlord and the tenants (including Tenant) of the Building based on their respective payments of the tax bill or charge that was the subject of the tax contest.

7.4     Delinquent Taxes.  If Landlord shall fail to pay any Taxes levied against the Building or underlying realty prior to delinquency, Tenant shall be permitted to pay same on Landlord's behalf and to deduct the amount paid from Minimum Rent and Additional Rent next due hereunder, including interest thereon at the Interest Rate from the date paid by Tenant until the date Tenant has recouped such payment.

## ARTICLE 8- UTILITIES

Tenant agrees to pay directly to the appropriate utility company all charges for utility services supplied to Tenant for which there is a separate meter and/or sub-meter to the Premises. Tenant agrees to pay to Landlord its share of all charges for utility services supplied to the Premises and the Common Area used exclusively by Tenant for which there is no separate meter or sub-meter upon billing by Landlord of Tenant's share, as reasonably determined by Landlord based upon estimated usage (but in no event shall Tenant's share exceed thirty percent (30%) of the amount of any bill). Landlord shall not be liable for any interruption whatsoever in utility services not furnished by Landlord, nor shall Landlord be liable for interruptions in utility services furnished by Landlord which are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or in order to make alterations, repairs or improvements. Notwithstanding the foregoing, in the event of an interruption in utility service to the Premises or the Common Area which is caused by the negligence or willful misconduct of Landlord or its Representatives, which interruption materially interferes with Tenant's ability to operate its business in the Premises then, in addition to Tenant's other rights and remedies under this Lease, Minimum Rent and Additional Rent shall abate from the commencement of such interruption until such interruption is corrected.

## ARTICLE 9- TENANT'S CONDUCT OF BUSINESS

9.1     Permitted Use. Tenant shall use the Premises solely for the Permitted Use specified in Section 1.17 and for no other use or purpose without first obtaining the Landlord's prior written consent.

9.2     Tenant's Signs.

(a)     Tenant shall be permitted to install interior signage in the First Floor Common Area. Any such signage shall be professionally prepared and maintained in a neat manner, and shall comply with all applicable laws, ordinances and regulations.

(b)     Tenant shall not affix upon the exterior (or interior windows or doors) of the Premises or anywhere adjacent to the Premises or the Building any sign, advertising placard, name, insignia, trademark, descriptive material or other like item (collectively, the "Exterior Signs"), unless the Exterior Signs (i) comply with all governmental requirements, and (ii) have been approved by the beneficiary of that certain _____, dated _____ and recorded in the Official Records of Los Angeles County as Instrument No. _____ on _____ ("Façade Easement"). All of the Exterior Signs shall be erected by Tenant at its sole cost and expense. Tenant shall maintain all of its Exterior Signs in good condition and repair during the Term. Notwithstanding anything herein to the contrary, Tenant shall be entitled, at Tenant's sole cost and expense, to place a sign panel on a monument sign or pylon sign, if any, erected at the Building, in the top position. Nothing herein shall be construed as a representation that Landlord will install a monument or pylon sign or an obligation of Landlord to install such a sign.

9.3     Building Name. The name of the Building where the Premises is located is "Pacific Stock Exchange Building" Tenant may use the name of the Building in its advertising as the address reference for the Premises. Tenant shall not use the name of the Building for any other purpose. Landlord reserves the right, in its sole discretion, to change the name and logo of the Building at any time. Tenant expressly acknowledges that Landlord has not made any representation with respect to the Landlord's rights to use the name "Pacific Stock Exchange" in connection with the name of the Building. Tenant shall conduct its own investigation prior to the usage of the Building name "Pacific Stock Exchange Building" in connection with the Tenant's advertisements containing such name.

9.4     Historical Status of Building. Tenant acknowledges the historical status of the Building and the fact that such status imposes certain special restrictions and limitations with respect to improvements and alterations to the Premises and signage on the exterior of the Building. Tenant agrees to comply with any revisions requested by Landlord to the plans for Tenant's Work or any subsequent alterations which are reasonably required by Landlord for the purpose of maintaining the Building's historical status and the eligibility of the Building for rehabilitation tax credits. Tenant acknowledges that Landlord has granted the Façade Easement under which a nonprofit organization has been granted certain control rights with respect to the facade of the Building and Tenant hereby agrees that this Lease, and any encumbrances hereafter existing on this Lease, are and shall be subordinated to such Façade Easement or any other similar easement which Landlord may grant and that the provisions of this Lease shall be subject to all restrictions and requirements reasonably imposed on Landlord in connection with such easement(s); provided, however, that in no event shall Landlord agree to amend the Façade Easement or enter into or amend any other similar easement in a manner which will interfere with Tenant's rights under this Lease or the operation of Tenant's business in the Premises or impose any additional financial obligations on Tenant.

9.5     Compliance with Laws. Tenant shall promptly comply with any and all present and future governmental laws, ordinances, rules, regulations and orders applicable to the Premises and Tenant's use and occupancy thereof for the Permitted Use, including but not limited to the Americans with Disabilities Act of 1990, 42 USC section 12101 et. seq. (the "ADA") and all analogous state and local laws, and all rules and regulations promulgated to further the purpose thereof (collectively, "Laws"). Tenant's obligations hereunder shall include the making of alterations, additions and improvements to the Premises required by any Law for the conduct or continuance of the Permitted Use in the Premises. Tenant's obligation to comply with Laws shall include, without limitation, the responsibility of Tenant to make alterations to the Premises regardless of, among other factors, the relationship of the cost of curative action to the rent payable under this Lease, the length of the then remaining Term hereof, the relative benefit of the repairs to Landlord or Tenant, the degree to which the curative action may interfere with

LA:17690599.5

7/17/09 01:36 PM

Tenant's use or enjoyment of the Premises, or the likelihood that the parties contemplated the particular Law involved. Tenant shall have the right to contest or review, by procedures permitted by applicable law, at its own expense, any such Law and may delay compliance therewith if permitted by such Law, provided that Landlord or any other tenant, occupant or owner of the Building is not subject to civil liability or criminal prosecution as a result thereof and Landlord's title to or interest in, or such tenant's, occupant's or owner's business in or title to, the Building, or any portion thereof, is not subjected to forfeiture, involuntary sale, loss or closure as a result thereof. Tenant shall indemnify, defend, protect and hold Landlord and such other tenants, occupants and owners harmless from and against any and all liability, loss, cost, damage or expense (including attorneys' fees) resulting from or in connection with any contest hereunder. Any contest shall be conducted with all due diligence. Tenant shall diligently comply with any final, non-appealable decision in any such contest. In addition, Tenant expressly acknowledges that Landlord has not made any representation regarding the compliance and/or noncompliance of any or all portions of the Building and/or the demised Premises to the Laws; and Tenant has made an independent investigation of the same and is satisfied with the current condition of the Building and the Premises prior to executing this Lease. Notwithstanding the foregoing and anything else in this Lease to the contrary, Tenant's obligation to comply with Laws is hereby expressly limited to requiring Tenant to perform any non-structural alterations, additions and improvements to the Premises required by any Law for the conduct or continuance of the Permitted Use in the Premises or as a result of Tenant's Work but shall not require Tenant to perform (i) any structural alterations, additions or improvements, (ii) any alterations additions or improvements to any portion of the Building other than the Premises including, without limitation any Common Area (whether or not Tenant is entitled to the exclusive right to use such portion of the Common Area), or (iii) any alterations additions or improvements which are generally required and not specifically required for restaurant use (i.e., general alterations, additions or improvements required for office or general retail use would be Landlord's responsibility). Landlord shall, at its sole cost and expense, promptly comply with any and all present and future Laws including, without limitation, any retrofit requirements (except to the extent to be performed by Tenant as a part of Tenant's Work) applicable to the Building including, without limitation, the Premises (but only to the extent that Tenant is not responsible for such compliance with respect to the Premises as provided hereinabove).

## ARTICLE 10- MAINTENANCE, REPAIRS AND ALTERATIONS

10.1    Landlord's Maintenance Obligations. Landlord shall maintain in good condition and repair, at its sole cost, the structural components and foundations, roofs (including roof membranes) and exterior surfaces of the exterior walls (specifically including window frames) of the Building which, for purposes hereof, includes all structures comprising the Building if and to the extent the Building is comprised of multiple structures. Landlord shall also maintain, in a first-class condition at its sole cost but subject to reimbursement from Common Area Costs to the extent provided by Section 11.4, the Common Area in the Building (except the First Floor Common Area during the period that Tenant is to maintain same pursuant to Section 10.4), all elevators in the Building (except the elevator to be maintained by Tenant during the period that Tenant is to maintain same pursuant to Section 5.6). Landlord acknowledges that the use of the Premises for the Permitted Use shall require the Premises to comply with health department requirements, which requirements include that the Premises be free of vermin and Landlord shall, at its sole cost, maintain or cause to be maintained all portions of the Building (other than the Premises) and the Common Area such that the same shall be free of vermin. Further, Landlord shall maintain, at its sole cost, any and all base building utility systems including electrical, plumbing and mechanical systems to the point of connection to those lines which exclusively serve the Premises and other premises within the Building (e.g., any main electrical panel, main sewer line, main gas line, etc.). Landlord's maintenance obligation hereunder shall not extend to (i) doors and door frames

servicing the Premises and any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance, (ii) windows servicing the Premises and any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance, and (iii) storefronts and any storefront awnings of the Premises or any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance. Notwithstanding the foregoing, if and to the extent any repairs or replacements are necessitated by the negligence or willful acts of Tenant or its Representatives or by reason of Tenant's failure to observe or perform any conditions or agreements contained in this Lease, the cost of same shall be the sole responsibility of Tenant. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable for failure to make repairs required to be made by Landlord under the provisions of this Lease unless Tenant has previously notified Landlord in writing of the need for such repairs and Landlord has failed to commence and complete the repairs within a reasonable period of time following receipt of Tenant's written notification.

10.2    *Landlord's Right of Entry.* Landlord, its agents, contractors, servants and employees may enter the Premises following at least Twenty-Four (24) hour prior written notice to Tenant, and Landlord's good faith efforts to coordinate such entry with Tenant's on-site management so as to minimize interference with Tenant's business operations (except in a case of emergency): (a) to examine the Premises; (b) to perform any obligation or exercise any right or remedy of Landlord under this Lease; (c) to perform work necessary to comply with laws, ordinances, rules or regulations of any public authority or of any insurance underwriter; and (d) to perform work that Landlord deems necessary to prevent waste or deterioration in connection with the Premises; provided, however, that if any such entry by Landlord is the result of the failure by Tenant to perform any work required to be performed by Tenant under this Lease, Landlord shall have no right to perform such work on Tenant's behalf unless Tenant fails to commence such work within ten (10) business days after written notice from Landlord of the need for such work (or if more than ten (10) business days shall be required to commence such work because of the nature of the work, if Tenant shall fail to diligently proceed to commence to perform such work within a reasonable period after receipt of written notice). If Landlord makes any repairs which Tenant is obligated to make pursuant to the terms of this Lease, Tenant shall pay the cost of such repairs to Landlord, as Additional Rent, within thirty (30) days after receipt of a bill from Landlord for same. Notwithstanding the foregoing, in the event that Tenant by written notice to Landlord disputes the need for any repair performed or to be performed by Landlord, Tenant's responsibility for any repair performed or to be performed by Landlord and/or the cost of any repair performed by Landlord, then Tenant shall have no responsibility to pay any cost of such repair to Landlord unless and until such obligation and amount is determined pursuant to the procedures(s) set forth in Section 22.10.

10.3    *Tenant's Maintenance Obligations.* Except for the portions and components of the Premises to be maintained by Landlord as set forth in Section 10.1 and the Base Building Systems to be maintained by Landlord as set forth in Section 10.1, Tenant, at its expense, shall keep the Premises and all utility facilities and systems exclusively serving the Premises (the "Tenant Utility Facilities"), including, but not limited to, all plumbing and electrical conduits, wiring, fixtures, pipes, floor covering, vents, HVAC System (as defined herein below), lighting, storefronts, plate glass and glazing, interior ceilings and the fire protection and suppression system components within the Premises, in good condition and repair and shall make repairs and/or replacements necessary to keep the Premises and Tenant Utility Facilities in such condition; provided, however, that the process to perform any maintenance, repairs or replacements by Tenant to portions of the Tenant Utility Facilities located outside of the Premises shall be subject to the prior written consent of Landlord. All replacements shall be of a quality equal to or exceeding that of the original. At the written request of Landlord, Tenant shall contract with a qualified, licensed HVAC service company approved by Landlord for the regular (but not less frequently than

quarterly) maintenance, repair and/or replacement (when necessary) of the heating, ventilating and air conditioning equipment serving the Premises (the "HVAC System") and shall provide Landlord with a copy of any service contract within ten (10) days following its execution. In addition, Tenant shall be solely responsible to contract with and pay for the trash disposal services as required by Tenant. Any such trash bins shall only be located adjacent to the Building and as convenient as possible to the Premises in an area mutually approved by Landlord and Tenant. Notwithstanding the foregoing, if and to the extent any repairs or replacements are necessitated by the negligence or willful acts of Landlord or its Representatives or by reason of Landlord's failure to observe or perform any conditions or agreements contained in this Lease, the cost of same shall be the sole responsibility of Landlord.

10.4    Tenant's Maintenance Obligations of the First Floor Common Area. Tenant shall also maintain the First Floor Common Area used by Tenant pursuant to Section 2.6 at the Tenant's sole cost during the term of this Lease so long as the Tenant is the only Tenant in the Building utilizing the First Floor Common Area. However, at such time as Landlord enters into a lease or other occupancy agreement for space in the Building during the Term of this Lease, then the maintenance obligation of the First Floor Common Area including all expenses and payments shall be Landlord's responsibility except for the maintenance of the First Floor Common Area restrooms which shall be maintained by Tenant and shall only be available for the exclusive use by Tenant, its Representatives and invitees during the Term of this Lease. The term "maintain" as used herein shall include the obligation to manage, repair, clean and, with respect to the restrooms, supply disposable toiletries. Landlord shall in any event provide all liability insurance for the Common Area including, without limitation, the First Floor Common Area and First Floor Common Area restrooms. Notwithstanding anything in this Lease to the contrary, so long as Tenant is responsible for the maintenance of the First Floor Common Area, Common Area Costs shall not include any cost incurred by Landlord in connection with maintenance of the First Floor Common Area.

10.5    Alterations.

(a)    Tenant shall not make or cause to be made to the Premises or the Tenant Utility Facilities any addition, renovation, alteration, reconstruction or change (collectively, "Alterations") (i) costing in excess of One Hundred Thousand Dollars ($100,000.00), (ii) involving structural changes or additions, (iii) affecting the exterior storefront, fire sprinkler systems, exterior walls, floor slab, or roof of the Premises, or (iv) requiring or resulting in any penetration of the roof, demising walls or floor slab of the Premises, without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    All Alterations shall be made under the supervision of a competent licensed architect (if the work involves the construction of improvements to the Premises as compared to aesthetic changes such as repainting, installing replacement lighting, floor covering, etc.) or competent licensed structural engineer (if any structural work is to be performed) satisfactory to Landlord and shall be made in accordance with plans and specifications with respect thereto, approved in writing by Landlord before the commencement of work.

(c)    Tenant shall provide Landlord with not less than ten (10) days prior written notice of the commencement of any Alterations in the Premises and Landlord shall have the right to enter upon the Premises to post customary notices of non-responsibility with respect thereto. Tenant, at its cost, shall obtain all required governmental permits and approvals for all Alterations and all such Alterations shall be performed strictly in accordance with all applicable laws, ordinances, rules or regulations of any public authority, in a good and workmanlike manner and diligently prosecuted to completion to the end that the Premises shall at all times be a complete unit except during the period of work. Construction work in connection with any Alterations shall be performed in such manner as not to obstruct the access to or

otherwise unreasonably interfere with the operation of business by any other occupant of the Building. All improvements to the Premises by Tenant including, but not limited to, recessed light fixtures, floor coverings and partitions and other similar tenant improvement items, but excluding trade fixtures including, but not limited to signs, sound systems, lighting systems (other than recessed lighting), furniture and equipment shall be deemed to be the property of Landlord upon installation thereof. Within thirty (30) days after the completion of any Alterations, Tenant shall deliver to Landlord a set of "as built" plans depicting the Alterations as actually constructed or installed (or a copy of the plans previously approved by Landlord marked to show any changes thereon). If Tenant shall make any permitted Alterations, Tenant shall, upon Landlord's written request, obtain "Builder's All Risk" insurance coverage in an amount reasonably required to cover the construction of such Alterations.

ARTICLE 11- COMMON AREA

11.1    Definition of Common Area. The term "Common Area", as used in this Lease, shall mean all areas within the exterior boundaries of the Building (or areas immediately adjacent to the Building and located on the underlying realty), now or later made available for the general use of Landlord, Tenant and other persons entitled to occupy any floor area in the Building.

11.2    Use of Common Area. The use and occupancy by Tenant of the Premises shall include the unobstructed right to the non-exclusive use by Tenant, its Representatives and invitees of the Common Area (except those portions of the Common Area on which have been constructed or placed permanent or temporary kiosks, displays, carts and stands and except areas used in the maintenance or operation of the Building) in common with Landlord and the other tenants of the Building and their customers and invitees with certain limitations as set forth in Section 2.6 of this Lease.

11.3    Control of and Changes to Common Area. Landlord shall have the sole and exclusive control of the Common Area, and the right to make changes to the Common Area. Landlord's rights shall include, but not be limited to, the right to (a) restrain the use of the Common Area by unauthorized persons; (b) utilize from time to time any portion of the Common Area for promotional, entertainment and related matters; (c) place permanent or temporary kiosks, displays, carts and stands in the Common Area and to lease same to tenants; provided, however, no such items will be placed in a manner which will materially interfere with Tenant's ability to operate its business from the Premises, impair ingress, egress or other access to or from the Premises, or impair the visibility of the Premises; (d) temporarily close any portion of the Common Area for repairs, improvements or Alterations, to discourage non-customer use, to prevent dedication or an easement by prescription or for any other reason deemed sufficient in Landlord's reasonable judgment; and (e) renovate, upgrade or change the shape and size of the Common Area or add, eliminate or change the location of improvements to the Common Area. Notwithstanding anything herein to the contrary, in no event shall Landlord without Tenant's prior written consent change the shape or size of or otherwise modify the Common Area located on the first through fourth floors of the Building.

11.4    Common Area Costs. The term "Common Area Costs", as used in this Lease, shall mean and be limited to all reasonable costs and expenses incurred by Landlord in (a) cleaning the façade of the Building from time to time, (b) maintaining the insurance required to be maintained by Landlord pursuant to Section 13.7, (c) subject to Section 10.4, maintaining the First Floor Common Area, and (d) subject to Section 5.6, maintaining and repairing the elevators. Common Area Costs shall expressly exclude any expenditures that are in the nature of capital improvements or replacements and not properly chargeable as an expense against income under the Internal Revenue Code or in accordance with generally accepted accounting principles.

11.5    Payment of Common Area Costs. Following the end of the calendar year in which the Rent Commencement Date occurs and following the end of each calendar year thereafter, Landlord shall furnish Tenant a statement ("Annual Statement") covering the calendar year just expired, showing the total of the Common Area Costs and Tenant's Share of Common Area Costs for such calendar year. Within thirty (30) days after receipt of the Annual Statement, Tenant shall pay to Landlord Tenant's Share of Common Area Costs for such calendar year. If Landlord fails to furnish any Annual Statement to Tenant within six (6) months following the end of any calendar year, such failure shall constitute a waiver by Landlord of its right to collect any Common Area Costs from Tenant for said calendar year. If Landlord fails to include any Common Area Cost in an Annual Statement and fails to correct said Annual Statement within six (6) months following the end of any calendar year, such failure shall constitute a waiver by Landlord to collect Tenant's Share of such Common Area Cost.

11.6    Information and Audit Rights. On Tenant's request, Landlord shall provide to Tenant copies of contracts, invoices, paid receipts or other sufficient evidence to support the Annual Statement (regardless of whether Tenant undertakes a complete audit under this Section). In addition, Tenant, or its agents, may conduct, at Tenant's expense, an audit of Common Area Costs for any calendar year within twelve (12) months of Tenant's receipt of the Annual Statement and any supporting documentation requested by Tenant pursuant to this Section. Notwithstanding the foregoing, if Tenant's audit for any calendar year reveals that (a) a type or category of Common Area Costs not authorized by Section 11.4 has been included in Common Area Costs, or (b) Common Area Costs have been overstated for the audit year by more than five percent (5%), Tenant may also audit Common Area Costs for the calendar year preceding the audit year. Tenant shall conduct its audit at Landlord's office in the continental United States during reasonable business hours on at least ten (10) days advance written notice. Any such audit may include without limitation inspection of the work undertaken and all original contracts, work orders, invoices and other records for said expenses. Landlord shall reasonably cooperate with Tenant in any such audit. If Tenant's audit reveals that Common Area Costs for the audit year are overstated, then Landlord shall reimburse Tenant the amount of such overpayment within thirty (30) days of receipt of documentation evidencing such overstatement and, if such audit reveals that Common Area Costs for the audit year are overstated by more than five percent (5%) for such year, Landlord shall also reimburse Tenant for the reasonable expenses of such audit within thirty (30) days of receipt of receipts or other documentation detailing the costs for said audit. In the event Landlord fails to timely make any such reimbursement required under this Section 11.6, Tenant shall be entitled to offset the amount due from Minimum Rent and Additional Rent next coming due.

## ARTICLE 12- ASSIGNMENT AND SUBLETTING

12.1    Landlord's Consent Required. Landlord and Tenant agree that the Building consists of an interdependent group of retail enterprises and that the realization of the benefits of this Lease, both to Landlord and Tenant, is dependent upon Tenant's creating and maintaining a successful and profitable retail operation in the Premises and that the "tenant mix" of the Building is vital to the realization of the benefits of this Lease, both to Landlord and Tenant. Tenant acknowledges and agrees that any assignment or subletting of all or any portion of the Premises shall required prior written consent of Landlord which consent shall not be unreasonably withheld, conditioned or delayed subject to the terms, covenants and conditions contained in this Lease.

12.2    Procedures. Should Tenant desire to enter into an assignment or sublease, other than any assignment or sublease which is expressly stated in this Article 12 not to require the prior written consent of Landlord, Tenant shall request, in writing, Landlord's consent to the proposed assignment or sublease at least thirty (30) days before the intended effective date of the proposed assignment or sublease, which request shall include the following (and shall be accompanied by a payment of Two Thousand Dollars

($2,000) to reimburse Landlord for costs incurred in connection with reviewing such proposed assignment or sublease): (a) if the assignment or sublease contemplates a change in the use of the Premises, the new proposed use of the proposed transferee; (b) a description of the identity, net worth and previous business experience of the proposed transferee; and (c) any further information relevant to the proposed assignment or sublease which Landlord may reasonably request. Within ten (10) days after receipt of Tenant's request for consent to the proposed assignment or sublease together with all of the above-required information, Landlord shall respond and shall have the right either to: (i) consent to the proposed assignment or sublease; or (ii) refuse to consent to the proposed assignment or sublease. Landlord's consent to a proposed assignment or sublease shall only be effective if and when Landlord has notified Tenant in writing that Landlord consents to such proposed assignment or sublease or Landlord fails to timely respond to a request for consent to any assignment or sublease in which event Landlord shall be deemed to have given its consent thereto. Upon Landlord's consent or deemed consent to a proposed assignment, Landlord, Tenant and the proposed transferee shall enter into and fully execute a written assignment and assumption agreement in a form reasonable acceptable to Landlord, Tenant and the proposed assignee. If Landlord refuses to consent to any proposed assignment or sublease, Landlord shall state in its response the detailed reason(s) for such refusal in reasonable detail.

12.3    Standard for Consent.

(a)    Tenant agrees that Landlord may refuse its consent to the proposed assignment or sublease on the following grounds: (i) the proposed transferee proposes to change the use of the Premises from the Permitted Use and Landlord reasonably withholds its consent thereto, (ii) the proposed transferee's financial condition, net worth or liquidity is inadequate to support all of the financial and other obligations of Tenant under this Lease or, with respect to any sublease, the obligation being incurred in connection therewith (in either event taking into account the financial condition, net worth and liquidity of any other remaining obligors under the Lease); (iii) the business reputation or character of the proposed transferee is not reasonably acceptable to Landlord; or (iv) the proposed transferee is not likely to conduct in the Premises a business of a quality substantially equal to that conducted by Tenant.

(b)    Any purported assignment without Landlord's prior written consent shall be void and of no force or effect and shall not confer any estate or benefit on anyone. Consent to one (1) assignment by Landlord shall not be deemed to be consent to any subsequent assignment to any other party.

12.4    Permitted Assignment/ Sublease. Notwithstanding anything in this Lease to the contrary, Tenant shall have the right without Landlord's consent, to enter into an assignment or sublease to any Affiliate or to any Person succeeding to substantially all of the assets of Tenant as a result of a consolidation or merger, or to a Person acquiring all or substantially all of the stock, other ownership interest or assets of Tenant ("Permitted Assignment"), provided that the Permitted Use will be conducted in the Premises and provided further that within fifteen (15) days after the effective date of any such transfer the assignee or sublessee executes and delivers to Landlord an instrument reasonably acceptable to Landlord containing an express assumption of all of Tenant's obligations under this Lease (or, in the case of a sublease, a copy of the sublease which shall provide that it is subject to the Lease, which copy may be redacted to delete economic terms).

12.5    No Release; Form. No assignment or Permitted Assignment, whether with or without Landlord's consent, shall relieve Tenant and Guarantor hereunder from its covenants and obligations under this Lease. Tenant and Guarantor shall be relieved from its covenants and obligations under this Lease only through a written agreement between Landlord, Tenant and Guarantor, not to be unreasonably withheld. It is the expressed intent of the parties that any such release will be given by Landlord if the

13.2    Policy Form.    All policies of insurance required of Tenant and Landlord herein shall be issued by insurance companies with a general policy holder's rating of not less than "A" and a financial rating of not less than Class "VII", as rated in the most current available "Best's Key Rating Guide", and which are qualified to do business in the Building State. All of Tenant's policies, except for the Workers' Compensation coverage, shall name and shall be for the mutual and joint benefit and protection of Landlord, Tenant and Landlord's property manager, mortgagee(s) or beneficiary(ies) as additional insureds provided Landlord shall have furnished to Tenant the names and addresses of such property manager, mortgagee(s) and beneficiary(ies). Executed copies of the policies of insurance or certificates evidencing such insurance shall be delivered to Landlord prior to Tenant, its agents or employees entering the Premises pursuant to this Lease for any purpose. Thereafter, executed copies of renewal policies or certificates shall be delivered to Landlord within ten (10) days prior to the expiration of the term of each policy. All policies of insurance delivered to Landlord must contain a provision that the company writing the policy will give to Landlord at least ten (10) days' prior written notice of any cancellation or lapse of insurance. All policies required of Tenant herein shall be endorsed to read that such policies are primary policies and any insurance carried by Landlord or Landlord's property manager shall be noncontributing with such policies. No policy required to be maintained by Tenant shall have a deductible greater than Fifteen Thousand Dollars ($15,000.00) unless approved in writing by Landlord.

13.3    Blanket Policies.    Notwithstanding anything to the contrary contained in this Article 13. Tenant's obligation to carry insurance may be satisfied by coverage under a so-called blanket policy or policies of insurance; provided, however, that the coverage afforded Landlord will not be reduced or diminished and the requirements set forth in this Lease are otherwise satisfied in such blanket policy or policies.

13.4    Indemnity.    To the fullest extent permitted by law and subject to Section 13.5, Tenant covenants with Landlord that, except to the extent caused by the negligence or misconduct of Landlord or its Representatives, neither Landlord nor its Representatives shall be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Tenant or any other person occurring from and after the Effective Date from any cause whatsoever related to the use, occupancy or enjoyment of the Premises by Tenant or its Representatives and Tenant shall pay for, defend (with an attorney approved by Landlord), indemnify, and save Landlord harmless against and from any real or alleged damage or injury and from all claims, judgments, liabilities, costs and expenses, including attorney's fees and costs, arising out of or connected therewith, or any repairs, Alterations or improvements (including original improvements and fixtures specified as Tenant's Work) which Tenant may make or cause to be made upon the Premises or any breach of this Lease by Tenant; provided, however, Tenant shall not be liable for such damage or injury to the extent and in the proportion that the same is ultimately determined to be attributable to the negligence or misconduct of Landlord or its Representatives, and Landlord shall pay for, defend (with an attorney approved by Tenant), indemnify, and save Tenant and its Representatives harmless against and from any and all claims, judgments, liabilities, costs and expenses, including attorneys fees and costs, resulting from any such damage or injury.

To the fullest extent permitted by law and subject to Section 13.5, Landlord covenants with Tenant that, except to the extent caused by the negligence or misconduct of Tenant or its Representatives, neither Tenant nor its Representatives shall be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Landlord or any other person occurring from and after the Effective Date from any cause whatsoever related to occurrences in the Building (other than the Premises) or Common Area and Landlord shall pay for, defend (with an attorney approved by Tenant), indemnify, and save Tenant and its Representatives harmless against and from any real or alleged damage

or injury and from all claims, judgments, liabilities, costs and expenses, including attorney's fees and costs, arising out of or connected therewith, or any repairs, alterations or improvements which Landlord may make or cause to be made to the Building or Common Area or any breach of this Lease by Landlord; provided, however, Landlord shall not be liable for such damage or injury to the extent and in the proportion that the same is ultimately determined to be attributable to the negligence or misconduct of Tenant or its Representatives, and Tenant shall pay for, defend (with an attorney approved by Landlord), indemnify, and save Landlord and its Representatives harmless against and from any and all claims, judgments, liabilities, costs and expenses, including attorneys fees and costs, resulting from any such damage or injury.

The obligations to indemnify set forth in this Section 13.4 shall include all attorneys' fees, litigation costs, investigation costs and court costs and all other costs, expenses and liabilities incurred by the indemnified party from the first notice that any claim or demand is to be made or may be made. All indemnity obligations under this Section 13.4 shall survive the expiration or earlier termination of this Lease.

13.5    Waiver of Subrogation. Landlord and Tenant each waive any rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Premises or its contents, or to other portions of the Building arising from any liability, loss, damage or injury caused by fire or other casualty for which property insurance is carried or required to be carried pursuant to this Lease. The insurance policies obtained by Landlord and Tenant pursuant to this Lease shall contain endorsements waiving any right of subrogation which the insurer may otherwise have against the non-insuring party. If Landlord has contracted with a third party for the management of the Building, the waiver of subrogation by Tenant herein shall also run in favor of such third party.

13.6    Failure by Tenant to Maintain Insurance. If Tenant refuses or neglects to secure and maintain insurance policies complying with the provisions of this Article 13, or to provide copies of policies or certificates or copies of renewal policies or certificates within the time provided in Section 13.2 (either or both such events is referred to as an "Insurance Failure"), Landlord may, after providing at least ten (10) days written notice to Tenant of its intention to do so and so long as an Insurance Failure continues, secure the appropriate insurance policies and Tenant shall pay, upon thirty (30) days following demand, the cost of same to Landlord, as Additional Rent.

13.7    Landlord's Insurance. Landlord shall maintain in force an insurance policy as required by the terms of Landlord's mortgage loan for the Building. In the absence of a mortgage loan and specified insurance requirements thereunder, Landlord shall maintain in force an insurance policy for the Building covering all perils generally included within the classification "Special Form–Risks of Direct Physical Loss" (excluding earthquake and flood) for the Building including the Premises. Said insurance policy shall insure one hundred percent (100%) of the full replacement cost of the Building, including the improvements, fixtures and equipment in the Building, but excluding (a) the trade fixtures, inventory and other personal property of tenants and (b) the value of excavations, underground utilities, foundations and footings. At Landlord's option, said insurance policy or policies may also include a rental loss endorsement covering loss of rents under its leases in the Building for a period not to exceed twelve (12) months. Landlord shall maintain in force a commercial general liability insurance policy insuring against bodily injury, death and property damage occurring in or about the Common Area of the Building. Said insurance policy or policies shall (a) name Tenant as additional insured, (b) have a per occurrence limit of at least $2,000,000 and a general aggregate limit of at least $5,000,000, (c) be primary and noncontributing with any insurance maintained by Tenant, and (d) include a blanket contractual liability

endorsement specifically insuring the performance by Landlord of the indemnity agreement as to liability for injury to or death of persons and injury or damage to property set forth in Section 13.4.

## ARTICLE 14- DAMAGE

14.1    Insured Casualty. In the case of damage by fire or other perils covered by the insurance specified in Section 13.7, the following provisions shall apply:

(a)    Within a period of sixty (60) days after all applicable permits have been obtained (which permits Landlord shall promptly apply for and diligently seek), Landlord shall commence such repair, reconstruction and restoration of the Building and the Premises to the condition which existed prior to such damage, and shall diligently prosecute the same to completion; provided, however, that Tenant, at its cost, shall repair and restore all items of Tenant's Work and replace its stock in trade, trade fixtures, furniture, furnishings and equipment. Tenant shall commence this work promptly upon delivery of possession of the Premises to Tenant with Landlord's restoration work complete and shall diligently prosecute same to completion.

(b)    Notwithstanding the foregoing, if the destruction occurs during the last two (2) years of the Term, or at any time if it is reasonably estimated that repair or restoration after a casualty which Landlord is obligated under the Lease to undertake will take more than two hundred seventy (270) days after the date of destruction for such work to complete, Landlord and Tenant shall each have the right to terminate this Lease by written notice delivered to the other delivered within sixty (60) days after the date of destruction.

14.2    Uninsured Casualty. If the Premises or the Building are damaged as a result of any casualty not covered by the insurance specified in Section 13.7 and not required to be covered by such insurance, within a period of sixty (60) days after all applicable permits have been obtained (which permits Landlord shall promptly apply for and diligently seek), Landlord shall commence such repair, reconstruction and restoration of the Building and the Premises to the condition which existed prior to such damage, and shall diligently prosecute the same to completion, or Landlord may elect by delivery of written notice to Tenant within sixty (60) days after the date of destruction not to so repair, reconstruct or restore the damaged property, in which event this Lease shall cease and terminate upon delivery of such notice. In the event Landlord elects to restore the Premises, Tenant shall have the same repair, restoration and replacement obligations it has pursuant to Section 14.1(a).

14.3    Distribution of Proceeds. In the event of the termination of this Lease pursuant to this Article 14, each party shall be entitled to the proceeds from the property insurance it maintains.

14.4    Abatement. From and after any such casualty and during any period of repair, reconstruction and restoration by Landlord and Tenant, as provided in this Article 14, the Minimum Rent and Additional Rent payable hereunder shall be abated proportionately with the degree to which Tenant's use of the Premises is impaired; provided, that Minimum Rent and Additional Rent payable hereunder shall be fully abated until Tenant reopens for business if it is not reasonably practicable for Tenant to continue operation of its business from the standpoint of prudent business management after any such casualty and during any period of repair, reconstruction and restoration by Landlord and Tenant. Tenant shall continue the operation of its business in the Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management and, except to the extent such damage or destruction is caused by the negligence or misconduct of Landlord or its Representatives, Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole

or any part of the Premises or the Building of which the Premises are a part, Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

14.5    Waiver of Termination. Tenant waives any statutory rights of termination which may arise by reason of any partial or total destruction of the Premises.

## ARTICLE 15- EMINENT DOMAIN

15.1    Taking. The term "Taking", as used in this Article 15, shall mean an appropriation or taking under the power of eminent domain by any public or quasi-public authority or a voluntary sale or conveyance in lieu of condemnation but under threat of condemnation.

15.2    Total Taking. In the event of a Taking of the entire Premises, this Lease shall terminate and expire as of the date possession is delivered to the condemning authority and Landlord and Tenant shall each be released from any liability accruing pursuant to this Lease after the date of such termination, but Minimum Rent and Additional Rent for the last month of Tenant's occupancy shall be prorated and Landlord shall refund to Tenant any Minimum Rent and Additional Rent paid in advance.

15.3    Partial Taking. If (a) there is a Taking of a material portion of the Premises and, regardless of the amount taken, the remainder of the Premises is not, in Tenant's sole but reasonable business judgment, suitable for the continued operation of Tenant's business, Tenant may terminate this Lease; or (b) there is a Taking of a material portion of the Common Area which renders the use of the Premises infeasible, either Landlord or Tenant may terminate this Lease, upon giving notice in writing of such election to the other party within thirty (30) days after receipt by Tenant from Landlord of written notice that a portion of the Premises and/or Common Area has been so appropriated or taken. In each case, the termination of this Lease shall be effective as of the earlier of the date Tenant is required to vacate the Premises, or the portion of the Premises and/or the Common Area is taken.

15.4    Award. In the event of a Total Taking or a Partial Taking, Landlord is entitled to all damages and compensation awarded or paid in connection with any such Total Taking or Partial Taking for its ownership interest in the Premises. Tenant is entitled to all damages and compensation awarded or paid in connection with any such Total Taking or Partial Taking for its leasehold interest in the Premises, its loss of business goodwill, relocation expenses, and the value of Tenant's trade fixtures, furniture and equipment and any leasehold improvements made at Tenant's expense. Landlord and Tenant are also each entitled to any compensation awarded for its attorneys' fees and/or litigation expenses.

15.3    Continuation of Lease. In the event of a Taking, if Landlord and Tenant elect not to terminate this Lease as provided above (or have no right to so terminate), Landlord agrees, at Landlord's cost and expense (to the extent of the condemnation proceeds) as soon as reasonably possible after the Taking, to restore the Premises and/or the Common Area necessary for Tenant to operate its business from the Premises in a like manner and character as existed prior to the Taking and, thereafter, Minimum Rent and Additional Rent payable by Tenant hereunder shall be reduced on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining, and Landlord shall be entitled to receive the total award or compensation in such proceedings. Notwithstanding the foregoing, if such restoration is not completed within one hundred fifty (150) days of such Taking or, notwithstanding such restoration, Landlord is unable to operate its business from the Premises in a like manner and character as existed prior to the Taking, then Tenant shall be permitted to terminated this Lease by written notice delivered to Landlord.

## ARTICLE 16- DEFAULTS BY TENANT

16.1    Events of Default. Should Tenant at any time be in default with respect to any payment of *Minimum Rent or Additional Rent* or any other charge payable by Tenant pursuant to this Lease for a period of five (5) business days after written notice from Landlord to Tenant, or should Tenant be in default in the prompt and full performance of any other of its promises, covenants or agreements herein contained for more than thirty (30) days (provided, however, if the default cannot be rectified or cured within such thirty (30) day period, the default shall be deemed to be rectified or cured if *Tenant, within* such thirty (30) day period, shall have commenced to rectify or cure the default and shall thereafter diligently and continuously prosecute same to completion) after written notice thereof from Landlord to Tenant specifying the particulars of the default, then Landlord may treat the occurrence of any one (1) or more of the foregoing events as a breach of this Lease and, in addition to any or all other rights or remedies of Landlord by law provided, Landlord shall have the right, at Landlord's option, to terminate this Lease and all of the rights of Tenant in or to the Premises. Notwithstanding anything which may be or appear to be to the contrary in this Lease, it is expressly understood and agreed that Tenant's liability under this Lease resulting from any default by Tenant or other claim arising under this Lease shall be limited to actual damages and not special, consequential or punitive damages or loss of profits.

16.2    Termination of Lease. Should *Landlord elect to terminate this Lease pursuant to the* provisions of Sections 16.1(a) above, Landlord may recover from Tenant, as damages, the following: (a) the worth at the time of award of any unpaid rental which had been earned at the time of the termination, plus (b) the worth at the time of award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided, plus (c) the worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided, plus (d) any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom plus, at Landlord's election, any other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the laws of the Building State.

As used in subparagraphs (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the Interest Rate. As used in subparagraph (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

16.3    Definitions of Rental. For purposes of this Article 16 only, the term "rental" shall be deemed to be Minimum Rent, Additional Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease. All sums, other than Minimum Rent, shall, for the purpose of calculating any amount due under the provisions of Section 16.2(c) above, be computed on the basis of the average monthly amount accruing during the immediately preceding sixty (60) month period, except that if it becomes necessary to compute these sums before the sixty (60) month period has occurred, then these sums shall be computed on the basis of the average monthly amount accruing during the shorter period.

## ARTICLE 17 - DEFAULTS BY LANDLORD

17.1    Landlord's Liability. If Landlord fails to perform any of the covenants, provisions or conditions contained in this Lease on its part to be performed within thirty (30) days after written notice

of default (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to diligently proceed to commence to cure the default after written notice), or if Landlord shall have breached any representation or warranty in this Lease, then Tenant shall be entitled to all rights and remedies available at law or in equity (including specific performance or other injunctive relief); provided, that Tenant in any action for damages against Landlord shall be only for actual damages (and not special, consequential or punitive damages or loss of profits) sustained by Tenant as a result of Landlord's breach or default and Tenant shall not be entitled to unilaterally terminate this Lease as a result thereof; provided, however, that nothing herein shall limit Tenant's right to bring an action to terminate this Lease as a result thereof. Notwithstanding anything contained in this Lease to the contrary, it is expressly understood and agreed that any judgment against Landlord resulting from any default or other claim under this Lease (excluding any claim involving misappropriation or fraud) shall be satisfied only out of (i) the rents, issues, profits and other income actually received from the operation of the Building, (ii) insurance proceeds, (iii) condemnation proceeds, and (iv) Landlord's equity in the Building and underlying realty, and no other property of Landlord or its Representatives, wherever situated, shall be subject to levy on any judgment obtained against Landlord. In the event Tenant obtains a money judgment against Landlord (whether in a mediation, arbitration, reference or court proceeding) which is not paid by Landlord within the time provided by said judgment or, if no time is provided, within the time provided by applicable law, Tenant shall be permitted to offset from Minimum Rent and Additional Rent next becoming due under this Lease, the amount of such judgment.

17.2    Cure by Assignee. If any part of the Premises is at any time subject to a first mortgage or a first deed of trust, and this Lease or the rentals due from Tenant hereunder are assigned by Landlord to a mortgagee, trustee or beneficiary ("Assignee" for purposes of this Article 17 only) and Tenant is given written notice of the assignment including the post office address of Assignee, then Tenant shall also give written notice of any default by Landlord to Assignee, specifying the default in reasonable detail and affording Assignee the same cure period afforded Landlord as provided in Section 17.1 to make performance for and on behalf of Landlord. If and when Assignee has made performance on behalf of Landlord, the default shall be deemed cured.

17.3    Tenant may make all payments and do all necessary work to cure any default by Landlord which is not cured after notice and within the applicable cure period. Landlord shall reimburse Tenant for all reasonable sums expended by Tenant to cure such default within thirty (30) days of Landlord's receipt of invoices, paid receipts or other sufficient evidence of said reasonable sums, together with interest at the Interest Rate from the date of Tenant's expenditure until paid in full. If the parties disagree on (a) whether or not Tenant has the right to cure Landlord's default under this Section 17.3 or (b) the amount of any sums due Tenant under this Section 17.3, then either party may submit the dispute to resolution in accordance with Section 22.10. Notwithstanding anything herein to the contrary, in the case of a bona fide emergency (e.g., danger to person or property including, without limitation, a roof leak or dangerous condition), provided Tenant first makes a reasonable, good faith effort to notify Landlord or the manager of the Building, Tenant shall be entitled to make such repairs as are necessary to remove the emergency for Landlord's account and Landlord will reimburse Tenant for the cost paid by Tenant in doing so within thirty (30) days after Tenant's delivery to Landlord of an invoice, together with reasonable back up documentation, for same.

17.4    If Landlord fails to pay Tenant the amounts due Tenant under Section 17.3 within the 30 day period referred to in Section 17.3, Tenant may notify Landlord in writing of its intent to deduct such amounts from rent ("Notice of Rental Offset"). If Landlord fails to pay Tenant such amounts within fifteen (15) days of the Notice of Rental Offset, Tenant may deduct such amounts from any and all Minimum Rent and Additional Rent payments due under this Lease. Nothing in this Lease shall preclude Tenant from collecting any amount paid by it under Section 17.3 without waiting for rental offsets to

accrue. Notwithstanding anything in this Section 17.3 to the contrary, if either party has initiated a proceeding in accordance with Section 22.10 to resolve a dispute respecting any exercise by Tenant of its rights under Section 17.3 or this Section 17.4, then Tenant shall not have the right to deduct such amounts from Minimum Rent or Additional Rent unless and until the proceeding determines that Tenant has the right to do so.

## ARTICLE 18- SUBORDINATION. ATTORNMENT AND TENANT'S CERTIFICATE

18.1    *Subordination.* Upon written request of Landlord, Landlord's mortgagee, the beneficiary of a deed of trust of Landlord or a lessor of Landlord, Tenant will subordinate its rights pursuant to this Lease in writing to the lien of any future mortgage, deed of trust or the interest of any future lease in which Landlord is the lessee (or, at Landlord's option, cause the lien of said mortgage, deed of trust or the interest of any lease in which Landlord is the lessee to be subordinated to this Lease) and to all advances hereafter to be made upon the security thereof; provided, however, that as a condition to such subordination, the subordination instrument shall be reasonably acceptable to Tenant and shall include a non-disturbance agreement confirming that Tenant's rights under the Lease and right to possession of the Premises will be recognized and not disturbed upon a foreclosure, sale or other transfer under any mortgage or deed of trust, or termination of any lease in which Landlord is the lessee. If the Premises are subject to one or more mortgages or deeds of trust as of the Effective Date or to a lease in which Landlord is the lessor, Landlord shall deliver to Tenant, concurrent with the execution of this Lease, a non-disturbance agreement ("NDA") executed by each such mortgagee, holder of a deed of trust and lessor in a form reasonably acceptable to Tenant and confirming that *Tenant's rights under the Lease and right to possession of the Premises will be recognized and not disturbed upon a foreclosure, sale or other transfer under any such mortgage or deed of trust, or termination of any lease in which Landlord is the lessee.*

18.2    Attornment. In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale or in the event of any transfer under any mortgage or deed of trust made by Landlord encumbering the Premises, or should a lease in which Landlord is the lessee be terminated, Tenant shall attorn to the purchaser or lessor under such lease upon any foreclosure, sale, transfer or lease termination and recognize the purchaser or lessor as Landlord under this Lease.

18.3    Estoppel Certificates. From time to time (but not more than twice in any calendar year), each party shall execute and deliver to the other (or to any third party specified by the requesting party), a written statement certifying the following information: (i) this Lease is in full force and effect and has not been amended, except for any amendments specifically stated, (ii) the expiration date of the Term of this Lease, subject to Tenant's right to extend the Term under Section 3.2, (iii) a statement that there are not, to such party's actual knowledge, uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed, (iv) a statement that, to such party's actual knowledge, such party has no claims or offsets against the requesting party, or specifying such claims or offsets if any are claimed, and (v) the then current monthly Minimum Rent payable under this Lease and the date through which such monthly Minimum Rent has been paid. Each party shall deliver such estoppel statement within thirty (30) days of a written request from the other party. *Any such estoppel statement may be relied on by any prospective purchaser, lender, assignee or subtenant of the Premises.*

## ARTICLE 19- QUIET ENJOYMENT

So long as Tenant is not in default beyond the applicable cure period (after receipt of notice of such default) of its obligation for payment of Minimum Rent and Additional Rent or its observation and performance of all of the other covenants, terms and conditions of this Lease to be observed and performed by Tenant, Landlord covenants that Tenant shall peaceably and quietly hold and enjoy the

Premises from and after delivery thereof to Tenant; subject, however, to all matters of record to which this Lease is subject; provided that none of such matters of record shall diminish the rights or increase the obligations of Tenant under this Lease, or interfere with or prevent the use of the Premises for the use specified in Section 1.17.

## ARTICLE 20- TITLE OF LANDLORD

Landlord represents, warrants and covenants that, as of the date of this Lease, (i) Landlord is the owner in fee title to the Building and underlying realty, and (ii) there are no liens upon its estate other than (a) covenants, conditions, restrictions, easements, ground leases, mortgages or deeds of trust currently of record (collectively, "Agreements"); (b) the effect of any zoning laws of the city, county and state where the Building is situated, and (c) general and special taxes not delinquent. Tenant agrees that as to its leasehold estate, Tenant will conform to and will not violate the terms of the Agreements, and Tenant will conform to and will not violate the terms of any amendments or modifications to the Agreements made from time to time provided that no such amendment or modification interferes with or prevents Tenant from using the Premises for the use set forth in Section 1.17, and does not diminish the rights or increase the obligations of Tenant under this Lease. Landlord covenants not to enter into or permit any amendment or modification of the Agreements which interferes with or prevents Tenant from using the Premises for the use set forth in Section 1.17, or diminishes the rights or increases the obligations of Tenant under this Lease.

## ARTICLE 21- [INTENTIONALLY LEFT BLANK]

## ARTICLE 22- MISCELLANEOUS

22.1    Notices. Every notice, demand or request required hereunder or by law to be given by either party to the other shall be in writing. Every provision of this Lease which provides that either party shall notify the other of any particular matter shall be governed by this Section. Notices shall be given by personal service or by United States certified or registered mail, postage prepaid, return receipt requested, or nationally recognized overnight private courier (e.g., Federal Express, UPS), addressed to the party to be served at the address indicated in Section 1.22 or such other address as the party to be served may from time to time designate in a notice to the other party. Notice personally served shall be effective when delivered to the party upon whom such notice is served. If served by registered or certified mail, notice shall be conclusively deemed served on the date shown on the return receipt, but if delivery is refused or the notice is unclaimed, notice shall conclusively be deemed given forty eight (48) hours after mailing. If served by nationally recognized private courier, notice to the addressee shall be conclusively deemed given as confirmed by the nationally recognized private courier service making delivery but if delivery is refused or the notice is unclaimed, notice shall conclusively be deemed given twenty-four (24) hours after deposit with the nationally recognized private courier. Copies of any notice shall be sent to the addresses, if any, designated for service of copies of notices in Section 1.22 but the inadvertent failure to serve a copy of a notice, either to the address so designated or in the manner provided in this Section, shall not render service of notice invalid if the original notice is served in accordance with this Section.

22.2    Security Deposit. The Security Deposit shall be held by Landlord as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this Lease to be kept and performed by Tenant during the Lease Term. If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of rent, and provided that notice of such default has been delivered and the applicable cure period has lapsed, Landlord may (but shall not be required to) use, apply or retain all or any part of the Security Deposit for the payment of any rent or any other sum in default or for the payment of any amount which Landlord may spend or become

obligated to spend by reason of Tenant's default. If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. The Security Deposit, or any balance thereof remaining after application by Landlord as permitted hereinabove, shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days following the expiration of the Lease Term or upon termination of the Lease.

22.3    Hazards Materials.

(a)    Tenant shall, at its sole cost and expense, comply with all federal, state and local laws and regulations relating to the storage, use, handling and disposal of hazardous, toxic or radioactive matter posing a risk of injury to health, safety or property (collectively, "Hazardous Materials") and applicable to Tenant's use of the Premises. Tenant represents and warrants that, except for materials falling within the definition of "Hazardous Materials" which are normally used and properly disposed of in the ordinary course of Tenant's business, or which are sold by Tenant in the ordinary course of Tenant's business, neither Tenant, nor its Representatives will store, dispose of, produce, use, transport or manufacture any Hazardous Materials in the Premises or any portion of the Building. Tenant shall notify Landlord and shall provide to Landlord a copy or copies of any environmental entitlements or inquiries related to the Premises if and when received by Tenant.

(b)    The clean-up and disposal of any Hazardous Materials released or deposited into or about the Premises and/or the Building by Tenant or its agents, contractors or employees ("Tenant Caused Release") shall be performed by Tenant at Tenant's sole cost and expense and shall be performed in accordance with all applicable laws, rules, regulations and ordinances, pursuant to a site assessment and removal/remediation plan prepared by a licensed and qualified geotechnical engineer and submitted to and approved in writing by Landlord prior to the commencement of any work. The foregoing notwithstanding, Landlord in Landlord's sole and absolute discretion may elect, by written notice to Tenant, to perform the testing, clean-up and disposal of such Hazardous Materials present due to a Tenant Caused Release and, in such event, Tenant shall pay to Landlord, within thirty (30) days of Tenant's receipt of written request therefor delivered together with copies of paid invoices, the actual third-party cost of same upon receipt from Landlord of Landlord's written invoice therefor. Notwithstanding the foregoing, in the event that Tenant by written notice to Landlord disputes the need for any testing, clean-up or disposal performed or to be performed by Landlord, Tenant's responsibility therefor and/or the cost thereof, then Tenant shall have no responsibility to pay any such cost to Landlord unless and until such obligation and amount is determined pursuant to the procedures(s) set forth in Section 22.10. Tenant agrees to indemnify, defend and hold Landlord and its Representatives harmless from any claims, judgments, damages, fines, penalties, costs (including attorney, consultant and expert fees), liabilities (including sums paid in settlement of claims) or loss which arise during or after the Term of this Lease, in connection with a Tenant Caused Release during the Term of this Lease (and the foregoing indemnity shall expressly survive the expiration of the Term or earlier termination of this Lease). Without limiting the generality of the foregoing, this indemnification does specifically cover costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of a Tenant Caused Release.

(c)    In the event that any Hazardous Materials are determined to be located in the Premises or in, on and/or under the Building, the presence of such Hazardous Materials are not the result of a Tenant Caused Release and such Hazardous Materials are required to be remediated pursuant to applicable laws

or the same have a material and adverse affect upon Tenant's use of or operation of its business from the Premises, Landlord shall perform or cause to be performed the necessary testing, remediation and clean-up of such Hazardous Materials in accordance with all applicable laws, rules, regulations and ordinances and at no expense to Tenant. Notwithstanding the foregoing, if the cost of the clean-up of such Hazardous Materials is reasonably estimated to exceed twenty percent (20%) of the then full replacement cost of the Premises and provided such Hazardous Materials are not present due to a Landlord Caused Release (as defined below), then Landlord shall be entitled to terminate this Lease by written notice delivered to Tenant within thirty (30) days after the date of the completion of an assessment of the discharge. Further, if it is reasonably estimated that the clean-up of such Hazardous Materials will cause the Premises to be uninhabitable or require Tenant to close its business therein for more than one hundred twenty (120) days, then Tenant shall be entitled to terminate this Lease by written notice delivered to Landlord within thirty (30) days after the date of the completion of an assessment of the discharge. Landlord shall promptly deliver to Tenant copies of all assessments of the discharge ordered or received by Landlord. Landlord agrees to indemnify, defend and hold Tenant and its Representatives harmless from any claims, judgments, damages, fines, penalties, costs (including attorney, consultant and expert fees), liabilities (including sums paid in settlement of claims) or loss which arise during or after the Term of this Lease, in connection with a Landlord Caused Release whether prior to or during the Term of this Lease (and the foregoing indemnity shall expressly survive the expiration of the Term or earlier termination of this Lease). Without limiting the generality of the foregoing, this indemnification does specifically cover costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of a Landlord Caused Release. As used herein, a "Landlord Caused Release" means a release or deposit into or about the Premises and/or the Building of Hazardous Materials by Landlord or its agents, contractors or employees.

(d)     From and after the determination that Hazardous Materials are located in the Premises or in, on and/or under the Building, and provided that the presence of such Hazardous Materials are not the result of a Tenant Caused Release and such Hazardous Materials are required to be remediated pursuant to applicable laws or the same have a material and adverse affect upon Tenant's use of or operation of its business from the Premises, then Minimum Rent and Additional Rent payable hereunder shall be abated proportionately with the degree to which Tenant's use of the Premises is impaired; provided, that Minimum Rent and Additional Rent payable hereunder shall be fully abated after such determination and until Tenant reopens for business if Tenant is prohibited by applicable laws from operating its business in the Premises until such remediation is completed or it is not reasonably practicable for Tenant to continue operation of its business from the standpoint of prudent business management after any such determination and during any period of remediation. Tenant shall continue the operation of its business in the Premises during any such period if permitted by applicable law and to the extent reasonably practicable from the standpoint of prudent business management and, except to the extent due to a Landlord Caused Release, Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises or the Building of which the Premises are a part, Tenant's personal property or any inconvenience or annoyance occasioned by such contamination or remediation.

(e)     Landlord represents and warrants to the best of its knowledge, as of the Effective Date, that neither the Premises nor the Building or underlying realty contains any Hazardous Materials requiring remediation in accordance with federal, state and local laws and regulations relating to Hazardous Materials.

22.4     Intentionally Left Blank.

22.5    Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, special orders, enemy or hostile governmental acting civil commotion, fire or other casualty, and other causes (except financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by that party for a period equal to the prevention, delay or stoppage, except the obligations imposed with regard to Minimum Rent and Additional Rent to be paid by Tenant pursuant to this Lease; provided the party prevented, delayed or stopped shall have given the other party written notice thereof within thirty (30) days of such event causing the prevention, delay or stoppage.

22.6    Termination and Holding Over. This Lease shall terminate without further notice upon the expiration of the Term. Upon the expiration or earlier termination of the Term, Tenant shall peaceably and quietly surrender the Premises broom-clean condition, reasonable wear and tear and any damage to the Premises which Tenant is not required to repair pursuant to Article 10 Article 14 or Article 15 excepted (it being expressly acknowledged that Tenant has no obligation to repair or restore any portion of the Premises if this Lease is terminated under Article 14 or Article 15). Subject to the foregoing, Tenant may, during the thirty (30) day period after expiration of the Term or earlier termination of this Lease ("Removal Period"), remove from the Premises any or all of trade fixtures, furniture, equipment and signs owned by Tenant or used by Tenant in the conduct of its business, and Tenant may remove any and all improvements, additions and Alterations to the extent such items are not permanently affixed to the Premises, and Tenant shall immediately repair any damage occasioned to the Premises by reason of any such removal so as to leave the Premises in a neat and clean condition. Should Tenant hold over in the Premises beyond the Removal Period, the holding over shall not constitute a renewal or extension of this Lease or give Tenant any rights under this Lease. In such event, Landlord may, in its sole discretion, treat Tenant as a tenant at will, subject to all of the terms and conditions in this Lease, except that Minimum Rent shall be an amount equal to one and one-half (1-1/2) times the sum of Minimum Rent which was payable by Tenant for the twelve (12) month period immediately preceding the expiration or earlier termination of this Lease.

22.7    Security Measure. Tenant hereby acknowledges that the Minimum Rent payable to Landlord hereunder does not include the cost of guard service or other security measures, and that Landlord shall have no obligation whatsoever to provide same. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties.

22.8    Guarantors. The Tenant's performance under this Lease shall be guaranteed by the individuals or entities, if any, as provided under Section 1.20 in the form attached hereto as Exhibit G and incorporated herein by reference. Tenant and Guarantor(s) hereby represent to Landlord that Guarantor(s) have financial interest in the Tenant's business and the said guarantees are executed in connection with the Guarantors' interest thereto.

22.9    Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the party of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof, together with interest thereon at the Interest Rate from the date paid, as it was not legally required to pay.

22.10   Mediation and Arbitration of Disputes. Any controversy or claim arising under this Lease shall, subject to agreement by the parties, be submitted to mediation.  If the parties do not agree to a mediation or if any mediation does not resolve any such controversy or claim, the parties agree to submit such controversy or claim to a binding arbitration in the County of Los Angeles, California under the rules of the American Arbitration Association. However, any action in unlawful detainer for the failure to pay Minimum Rent or Additional Rent shall not be subject to this Section 22.10; provided, however, that Landlord shall have no right to bring an unlawful detainer action (i) for the failure to pay Additional Rent with respect to any obligation under this Lease which expressly provides that any dispute with respect thereto is to be determined through the procedures(s) set forth in Section 22.10, or (ii) in connection with the exercise by Tenant of any offset right expressly provided in this Lease, and any dispute with respect thereto shall be resolved through the procedures(s) set forth in this Section 22.10.

22.11   Miscellaneous Provisions.

(a)   Any waiver by either party of a breach by the other party of a covenant of this Lease shall not be construed as a waiver of a subsequent breach of the same covenant. Whenever a party is entitled to consent to or approve of any matter herein (including any Exhibit hereof), such consent may not be unreasonably withheld, conditioned or delayed.  The consent or approval by either party to anything requiring such party's consent or approval shall not be deemed a waiver of such party's right to withhold consent or approval of any subsequent similar act.  No breach of a covenant of this Lease shall be deemed to have been waived by the other party unless the waiver is in writing and is signed by such party.

(b)   Except as provided herein to the contrary, the respective rights and remedies of the parties specified in this Lease shall be cumulative and in addition to any rights and remedies not specified in this Lease. It is understood that there are no oral or written agreements or representations between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, agreements and understandings, if any, between Landlord and Tenant. No provision of this Lease may be amended except by an agreement in writing signed by Landlord and Tenant. If any provision of this Lease or the application of such provision to any person, entity or circumstance is found invalid or unenforceable by a court of competent jurisdiction, such determination shall not affect the other provisions of this Lease and all other provisions of this Lease shall be deemed valid and enforceable.

(c)   As used in this Lease, the term "CPI" shall mean the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics (the "Bureau") "All Items" for All Urban Consumers in the Los Angeles-Anaheim-Riverside metropolitan area, (1982- 84=100). Should the Bureau discontinue the publication of the Index, publish the same less frequently or alter the same in some other manner, the most nearly comparable index or procedure as determined by Landlord shall be substituted therefor.

(d)   This Lease shall be governed by and construed in accordance with the laws of the State of California without giving effect to the choice of law provisions thereof.

(e)   Subject to the terms of this Lease, all rights and obligations of Landlord and Tenant under this Lease shall extend to and bind the respective heirs, executors, administrators and the permitted concessionaires, successors, subtenants and assignees of the parties. If there is more than one (1) Tenant hereunder, each shall be bound jointly and severally by the terms, covenants and agreements contained in this Lease.

(f)   Time is of the essence of all provisions of this Lease of which time is an element.

LA:17690599.5

7/17/09 01:36 PM

(g)    If Tenant or Landlord is a corporation, partnership or limited liability company, each individual executing this Lease on behalf of the corporation, partnership or limited liability company (in his/her representative capacity only) represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the corporation, partnership or limited liability company and that this Lease is binding upon the corporation, partnership or limited liability company.

(h)    Tenant shall observe faithfully and comply with, and shall cause its employees and invitees to observe faithfully and comply with, reasonable and nondiscriminatory rules and regulations governing the Building as may from time to time be promulgated by Landlord, which rules and regulations currently include the provisions of Exhibit F.

(i)    Tenant waives any and all rights of redemption granted under any present and future laws in the event Landlord obtains the right to possession of the Premises in accordance with and pursuant to applicable law by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

(j)    Tenant represents and warrants to Landlord that it has not had any dealings with any realtors, brokers or agents in connection with the negotiation of this Lease, and hereby agrees to indemnify and hold Landlord and its Representatives harmless from any and all liability, loss, cost, damage or expense (including attorneys' fees and costs) arising from the breach of said representation and warranty. Landlord represents and warrants to Tenant that it has not had any dealings with any realtors, brokers or agents in connection with the negotiation of this Lease, and hereby agrees to indemnify and hold Tenant and its Representatives harmless from any and all liability, loss, cost, damage or expense (including attorneys' fees and costs) arising from the breach of said representation and warranty.

(k)    Upon either party's request, the other party agrees to execute and acknowledge a short form memorandum of this Lease for recording purposes in a form reasonably acceptable to Landlord and Tenant, which short form may be recorded by Landlord or Tenant. In no other event shall this Lease or a short form memorandum of this Lease be recorded.

(l)    Should Landlord sell, exchange or assign this Lease (other than a conditional assignment as security for a loan), then Landlord, as transferor, shall be relieved of any and all obligations on the part of Landlord accruing under this Lease from and after the date of such transfer provided that Landlord has transferred the Security Deposit and any unapplied Prepaid Rent (as described in Section 1.24) to Landlord's transferee and provided that Landlord's successor in interest has assumed in writing Landlord's obligations under the Lease which accrue from and after such date. Written notice of any such transfer together with a copy of such assumption shall be given to Tenant. Nothing herein contained shall be construed to release Landlord or any successor owner as Landlord from any liability or obligation which otherwise matured prior to the effective date of any transfer. Notwithstanding the foregoing, each successor transferee of Landlord's interest in the Premises shall, without further agreement, be bound by Landlord's covenants and obligations under this Lease until any further transfer by such successor transferee (together with the transfer of the Security Deposit and any unapplied Prepaid Rent), and written assumption of Landlord's covenants and obligations under this Lease by the transferee of such successor transferee as provided hereinabove.

(m)    Except where another rate of interest is specifically provided for in this Lease, any amount due from either party to the other under this Lease which is not paid when due, shall bear interest at the rate per annum ("Interest Rate") equal to the prime interest rate the prime rate published from time

to time by the Wall Street Journal plus two (2) percentage points (but in no event to exceed the maximum lawful rate) from the date such amount was originally due to and including the date of payment.

(n)    During the last one hundred eighty (180) days of the Term, Landlord shall have the right to go upon the Premises to show same to prospective tenants or purchasers during normal business hours and upon reasonable notice to Tenant.

(o)    Tenant shall pay all costs for work performed by or on account of it and shall keep the Premises and the Building free and clear of mechanics' liens or any other liens in connection therewith. Tenant shall give Landlord immediate notice upon Tenant receiving actual notice of any lien filed against the Premises or the Building as a result of any work of improvement performed by or on behalf of Tenant. Tenant shall immediately cause any lien to be discharged or removed off record by either paying the amount thereof or recording a statutory lien release bond in an amount equal to one hundred fifty percent (150%) of the amount of said lien, or such other amount as may be adequate to cause the lien to be released as an encumbrance against the Premises and the Building. If Tenant fails to do so, Landlord shall have the right, but not the obligation, in addition to all other rights and remedies available to Landlord under this Lease, and after ten (10) days prior written notice to Tenant, to either pay and discharge such lien, without regard to the validity thereof, or procure and cause to be recorded a statutory lien release bond and to (i) collect from Tenant as Additional Rent; or (ii) deduct from any tenant improvement allowance or any other amount payable by Landlord to Tenant under this Lease (A) all costs incurred by Landlord in paying and discharging such lien, or in procuring such bond, and (B) all reasonable third-party expenses incurred by Landlord in connection with such lien, including reasonable attorneys' fees and costs and recording fees. Landlord shall pay when due any amount due under a lien or encumbrance (including, without limitation, any mechanics' lien filed in connection with any work performed by or on account of Landlord) that could result in a termination of this Lease if not paid.

(p)    Intentionally Left Blank.

(q)    In the event that, at any time after the date of this Lease, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the party not prevailing in such action or proceeding shall reimburse the prevailing party for its actual attorneys' fees, and all fees, costs and expenses incurred in connection with such action or proceeding, including, without limitation, any post-judgment fees, costs or expenses incurred on any appeal or in collection of any judgment.

(r)    Landlord reserves the absolute right to effect such other tenancies in the Building as Landlord, in the exercise of its sole business judgment, shall determine to best promote the interests of the Building. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or number of tenants shall occupy any space in the Building or operate business during the Term of this Lease.

(s)    Tenant shall be required to utilize Landlord's roofing contractor in the event Tenant or Tenant's agents desire to penetrate the roof of the Premises for any repairs, alterations or improvements permitted to be made to the Premises by Tenant pursuant to the terms of this Lease; provided, however, if Landlord and Tenant reasonably determine that Landlord's roofing contractor's rates are not reasonably competitive, Tenant shall have the right to utilize any other licensed and reputable roofing contractor reasonably acceptable to Landlord.

(t)    Upon Landlord's request, Tenant shall provide Landlord with written notice of Tenant's designated representative for Landlord or its property manager to contact in the event of emergencies at the Building or Premises, and his or her name, address, phone number and facsimile number.

(u)    Tenant shall have the right to obtain independent security personnel for its Premises; and may provide security personnel which carry firearms as required by the CUP's conditions of approval and the Security Plan endorsed by the Los Angeles Police Department. Tenant shall at all times remain liable for such security personnel and shall indemnify, defend and protect Landlord against any claims or damages pursuant to the indemnification provisions set forth in Section 13.4.

22.12    Exhibits. The following Exhibits are attached to this Lease and, by this reference, made a part of this Lease:

| | |
|---|---|
| Exhibit A | Site Plan |
| Exhibit B | Legal Description |
| Exhibit C | Rent Commencement Date Certification |
| Exhibit D | Construction Provisions |
| Exhibit E | Intentionally Left Blank |
| Exhibit F | Rules and Regulations |
| Exhibit G | Guaranty |

SIGNATURE PAGE TO LEASE AGREEMENT BETWEEN
PAX AMERICA LLC AND HAWKEYE ENTERTAINMENT LLC

DATE:    July 17, 2009

PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057

By: _____
Kevin K. Choe
President

DATE:

HAWKEYE ENTERTAINMENT, LLC.
14242 Ventura Blvd #212
Sherman Oaks, CA 91423

By: _____
　　　Name:
　　　Title:



SIGNATURE PAGE TO LEASE AGREEMENT BETWEEN
PAX AMERICA LLC AND HAWKEYE ENTERTAINMENT LLC

DATE:


PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057


By: _____
    Kevin K. Choe
    President



DATE:


HAWKEYE ENTERTAINMENT, LLC.
14242 Ventura Blvd #212
Sherman Oaks, CA 91423


By: _____
Name:
Title:

EXHIBIT D

## CONSTRUCTION PROVISIONS

1.      Description of Tenant's Work. Unless otherwise provided in the Lease Agreement, all work to be done in the Premises shall be provided by Tenant at Tenant's sole cost and expense (the "Tenant's Work"). Tenant's Work shall include, but shall not be limited to, all leasehold improvements, fixtures, equipment and personal property necessary for Tenant to open from the Premises for the use set forth in Section 1.17.

1.1      High Rise Retrofit as Tenant Improvement. Landlord and Tenant both acknowledge and agree that for the purposes of consolidating contractors, and for working in the most efficient manner towards completing all required construction as imposed by local governmental and administrative agencies, Tenant will oversee and manage the construction necessary to perform the Required Retrofit Work (as defined in Section 5.8 of the Lease). The Required Retrofit Work will be performed by Tenant as a part of Tenant's Work, subject to Landlord's payment of the cost of the Required Retrofit Work as provided hereinbelow.

1.2      Limitation on Work: Landlord expressly agrees that the Required Retrofit Work is limited to the work as required by LADBS under the notice of noncompliance dated December 10, 2006 issued by Inspector John Jones. Any future notices of noncompliance per governmental or administrative agencies that arise at a future date from the signing of the Lease will not be included under the Required Retrofit Work and Landlord expressly agrees that, subject to Section 9.5 of the Lease, any such future requirements for the Building will be the sole responsibility of Landlord. Landlord further represents and warrants that no other notices of noncompliance, violations, or other such notices of similar character exist to Landlord's knowledge as of the date of this Lease. In the event that any such governmental or administrative agency notices come to light that are not expressly included in this agreement, any work required will not be considered a part of Tenant's Work or the Required Retrofit Work s Tenant Improvements or High Rise Retrofit work within the scope of work described herein, and will be borne at the sole expense of Landlord.

1.3      High Rise Retrofit Expenses. Cost for the Required Retrofit Work shall be borne by Landlord exclusively. As of the Effective Date, it is not anticipated that the cost of the Required Retrofit Work will exceed $1.1 Million; however, Landlord agrees that it shall be solely responsible for any such cost to the extent it exceeds $1.1 Million. In the event the cost of the Required Retrofit Work exceeds $1.1 Million, Landlord may conduct, at Landlord's expense, an audit of Tenant's costs and expenses related to the Required Retrofit Work. If Landlord's audit reveals that costs for the Required Retrofit Work are overstated, then Tenant shall reimburse Landlord the amount of such overpayment within thirty (30) days of receipt of documentation evidencing such overstatement and, if such audit reveals that costs are overstated by more than five percent (5%), Tenant shall also reimburse Landlord for the reasonable expenses of such audit within thirty (30) days of receipt of receipts or other documentation detailing the costs for said audit. Landlord agrees to forward payment to Tenant for the completion of the Required Retrofit Work in accordance with the schedule below. The detailed scope of the Required Retrofit Work shall be agreed upon by both Landlord and Tenant prior to Tenant's commencement thereof. Approval of such scope of work shall not to be unreasonably withheld by either party.

1.4      Tenant Improvement Allowance. The Tenant Improvement Allowance in the amount set forth in Section 5.2 of the Lease shall be paid by Landlord to Tenant concurrent with the execution of the Lease.

1.5    Required Retrofit Work Schedule. The funds for payment of the Required Retrofit Work shall be retained in the Client Trust Account of the Law Offices of Peter A. Kim for distribution according to the following schedule:

- $275,000 shall be disbursed upon execution of the Lease;

- $275,000 shall be disbursed upon issuance of building permit(s) for the Required Retrofit Work;

- $275,000 shall be disbursed at 50% completion of the Required Retrofit Work; and

- The balance required to complete the Required Retrofit Work upon Tenant (i) obtaining written sign off or approval from the fire department and building department for the Required Retrofit Work, and (ii) providing Landlord with unconditional waiver and lien releases from the contractors, including material and equipment suppliers, in the form required by California Civil Code Section 3262.

2.    Provisions For Completion of Plans and Specifications and Construction of Premises.

(a)    The procedure for approval of Tenant's plans and specifications is as follows:

(i)    Within thirty (30) days of the execution of this Lease, Tenant shall submit to Landlord four (4) sets of fully-dimensioned one-quarter inch (1/4") scale drawings and specifications prepared by Tenant's licensed architect at Tenant's expense, which drawings shall indicate clearly and in detail all specific changes and alterations to the Premises including, but not limited to, the storefront, interior partitions, fixture plans, plumbing, lighting, electrical outlets and all of Tenant's Work, as described above. Any and all such plans shall be subject to Landlord's prior written approval. Landlord shall have ten (10) business days within which to approve or disapprove Tenant's proposed plans. In the event Landlord shall disapprove Tenant's plans, Landlord shall provide Tenant with written specific objections, and Tenant shall have ten (10) business days within which to amend its proposed plans and incorporate Landlord's required changes.

(ii)    Upon Landlord's approval of Tenant's proposed plans, Tenant shall promptly submit such approved plans to the appropriate governmental authority for plan checking and the issuance of a building permit. In the event such governmental authority requires any changes to such approved plans prior to the issuance of a building permit, Tenant shall, at its sole cost and expense, promptly change such plans pursuant to such governmental request and submit such changed plans to Landlord for its approval. Landlord shall have five (5) business days within which to approve or disapprove such changed plans. In the event Landlord shall disapprove such changed plans, Landlord shall provide Tenant with written specific objections, and Tenant shall have five (5) business days within which to amend such plans and incorporate Landlord's required changes. Upon Landlord's approval of the changed plans, Tenant shall promptly resubmit such plans to the appropriate governmental authority for plan checking and the issuance of a building permit as previously set forth in this Subparagraph (ii). Upon Tenant's receipt of a building permit and any other necessary governmental approvals for Tenant's Work based upon plans approved by Landlord (the "Final Approved Plans"), and after the Turnover Date, Tenant shall immediately commence construction of Tenant's Work and shall diligently pursue such construction to completion in accordance with the Final Approved Plans.

(iii) No changes, modifications or alterations to the Final Approved Plans may be made without the prior written consent of Landlord. Any additional costs and expenses including, without limitation,

increased fees which Landlord may be required to pay for architectural, engineering and other similar services arising by reason of any change, modification or alteration to the Final Approved Plans, any additional construction costs including costs of change orders charged by Landlord's contractor and any and all other costs, expenses and/or damages incurred or suffered by Landlord by reason of the changes, modifications or alterations to the Final Approved Plans and any delays directly or indirectly caused by such damages, modifications or alterations to the Final Approved Plans shall be at the sole cost and expense of Tenant and shall be paid by Tenant to Landlord before the performance of the work requested by Tenant.

(b)    Tenant shall not commence any work in the Premises unless and until the following conditions have been met: (i) Final Approved Plans shall have been achieved; (ii) Tenant shall require that each contractor have a valid license for purposes of executing the work from the California State Contractor's License Board ("SCLB") and no complaint has been filed against such contractor with SCLB; (iii) Tenant shall have obtained all permits and approvals from all appropriate governmental authorities for the Tenant's Work and shall furnish Landlord with copies of all such permits; (iv) Tenant, its contractor and subcontractors (collectively, "Tenant's Agents") shall have procured all insurance required under the provisions of the Lease and shall have furnished Landlord with certificates of such insurance in accordance with the provisions of the Lease; and (v) Tenant has transferred all utilities serving the Premises to Tenant's account. Upon delivery of possession of the Premises, Tenant shall be responsible for re-keying the doors of the Premises, and all costs associated with such change; provided, however, at such time as the doors of the Premises are re-keyed, Tenant shall promptly provide Landlord with three (3) keys for entering the Premises pursuant to the terms of this Lease

(c)    (i)    The Tenant's Work shall be constructed in accordance with the Final Approved Plans in a good and workmanlike manner and in compliance with all applicable laws. Neither Landlord nor its Representatives shall interfere with, obstruct, or delay, any work in the Premises. Tenant and Tenant's Agents shall abide by all reasonable rules made by Landlord's contractor with respect to the storage of materials and coordination of work with other work being performed in the Building. Each of Tenant's Agents shall warrant that the portion of the Tenant's Work for which it is responsible shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the *date of completion thereof*. Each of Tenant's Agents shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract that shall become defective within one (1) year after the completion of the work performed by such contractor or subcontractors. All such warranties or guarantees as to materials or workmanship of or with respect to the Tenant's Work shall be written such that such guarantees or warranties shall inure to the benefit of Landlord and Tenant, as *their respective interests may appear*, and can be directly enforced by any of them. Tenant covenants to give to Landlord any assignment or other assurances which may be necessary to effect such right of direct enforcement.

(ii) All of Tenant's Agents shall carry worker's compensation insurance covering all of their *respective employees, and shall also carry public liability insurance*, including property damage, with limits of not less than Two Million Dollars ($2,000,000.00) single limit coverage per occurrence with an annual aggregate of not less than Four Million Dollars ($4,000,000.00) for bodily injury, personal injury, death and property damage, issued by insurance companies with a general policyholder's rating of not less than "A" and a financial rating of not less than Class "VII", as rated in the most current available "*Best's Key Rating Guide*", and which are qualified to do business in California; and the policies shall insure to the benefit of Tenant and Landlord, as their interests may appear. In addition, during the course of performance of the Tenant's Work, Tenant shall carry "Builder's All Risk" insurance in an amount reasonably required to cover the construction of Tenant's Work. Certificates for all insurance carried

pursuant hereto shall be delivered to Landlord before the commencement of construction of the Tenant's Work and all such policies of insurance must contain a provision that the company writing said policy will give Landlord ten (10) days prior written notice of any cancellation or lapse of the effective date. In the event that the Tenant's Work is damaged by any cause during the course of the construction thereof, Tenant shall immediately repair the same at Tenant's sole cost and expense. Tenant's Agents shall maintain all of the foregoing insurance coverage in force until the Tenant's Work is completed. All insurance required hereunder (except Workers' Compensation) shall preclude subrogation claims by the insurer against anyone insured thereunder and shall provide that it is primary insurance as respects Landlord and that any other insurance maintained by Landlord and is excess and noncontributing with the insurance required hereunder.

(iii) Within ten (10) days after completion of construction of the Tenant's Work, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County in which the Premises is located in accordance with the laws of the State of California, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at Tenant's sole cost and expense. Within thirty (30) days following the completion of the Tenant's Work, Tenant shall deliver to Landlord (i) a set of as-built drawings for the Premises (or a copy of the Final Approved Plans marked to show field changes), and (ii) a copy of all warranties, guaranties and operating manuals and information relating to the improvements, equipment, and systems in the Premises. Tenant shall exercise commercially reasonable efforts to obtain a certificate of occupancy for the Premises promptly following completion of the Tenant's Work.

## AMMENDMENT TO THE LEASE

This Amendment to the Lease is entered into as of August 5, 2009 by and between Landlord, PAX DEVELOPMENT, LLC, and Tenant, HAWKEYE ENTERTAINMENT, LLC.

It is the expressed intent of the parties to modify and amend the lease as follows:

1. Landlord shall make payments for the following:

   | | | |
   |---|---|---|
   | i) | High Rise Retrofit Work | $1,100,000.00 |
   | ii) | Tenant Improvements | $540,000.00 |
   | iii) | Security Deposit Refund | $39,000.00 |
   | iv) | Additional Improvement Work | $17,500.00 |
   | v) | Cleanup of pigeon droppings | $4,500.00 |

2. Landlord shall grant an additional four (4) months of rent abatement to Tenant for the eleventh (11) and twelfth (12) month and twenty third (23) and twenty fourth (24) month after the rental commencement date.

3. Landlord grants Tenant the right to use the designated storage space in the basement area of the building until such time that Landlord requires use of the designated space for a new tenancy. In event that Tenant is required to remove their items from storage, Landlord will provide Tenant with a comparable storage area in the building as available.

Both Landlord and Tenant agree that all other terms and conditions of the Lease remain in effect throughout the term of the lease.

DATE: August 5, 2009

PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057

By: _____
    Kevin K. Choe
    President

DATE: August 5, 2009

HAWKEYE ENTERTAINMENT, LLC.
14242 Ventura Blvd #212
Sherman Oaks, CA 91423

By: _____
    Name:
    Title

# AMMENDMENT TO LEASE

This Amendment to the Lease is entered into as of August 17, 2009 by and between Landlord, PAX DEVELOPMENT, LLC. and Tenant, HAWKEYE ENTERTAINMENT, LLC.

For good and valuable consideration hereby acknowledged and received by Landlord, it is the expressed intent of the parties to modify and amend the lease as follows:

## ARTICLE I – Tower Renovations

1.1 <u>Exclusive Use of Previously Designated Common Area:</u> Landlord grants Tenant the exclusive right to the ground floor hallway previously designated as Common Area until such time as the Tower portion (hereby defined as floors 5 to the roof) have completed their renovation.

1.2 <u>Construction:</u> During the renovation construction of the upper floors, Landlord shall install a separating wall between the elevators, and above the entrance in order to control dust, debris and noise from the construction.

1.3 <u>Completion Date Defined:</u> Renovation Completion Date is designated as the date in which Landlord has secured all necessary permits and licenses in order to occupy the space in the designated floors. Written notice of completion of renovation work shall be provided to Tenant by way of Certified Mail/Return Receipt Requested.

1.4 <u>Access to Building:</u> During the period of Exclusive Use as defined in Article 1.1 above, Landlord will not disturb Tenant's use of the main hallway and entrance to the building. Landlord will obtain access to the building only through the alley entrance on the eastern side of the building.

1.5 <u>Elevators:</u> Landlord acknowledges Tenant's renovation and repair of the north side elevator. Landlord expressly agrees that Landlord shall repair the south side elevator and use the south side elevator exclusively for the repairs on the tower portion of the building. All work on the elevators must comply with all local and state regulations.

1.6 <u>Landlord Access:</u> Thirty calendar days after receipt of written notice as defined in Article 1.2 above, Landlord shall reacquire access to the main entrance of the building, the common area hallway, and the use of both elevators. Use of these areas as common area shall be limited to day time hours only so as not to interfere with Tenant's operations. Common area access in the evening shall be limited to the eastern entrance only.

## ARTICLE II – Option Term

2.1 <u>Additional Option Term:</u> Landlord hereby grants Tenant an additional two (2) option periods to extend the lease. Each option is for an additional five (5) year period. These option periods are in addition to the option periods defined in the Lease agreement.

## ARTICLE III – Additional Space

3.1 <u>Exclusive Use of Office Space:</u> In addition to Tenant exclusive use of the ground floor office spaces which run on both sides of the main corridor, Landlord grants to Tenant exclusive use of the Fire Control Room as security office for the duration of the Lease Term. Tenant shall grant Landlord open access to Fire Control Room for any and all required repairs to the building systems upon receipt of written notice from Landlord.

3.2    <u>Exclusive Use of Ground Floor Bathrooms</u>:  Landlord grants to Tenant exclusive use of the ground floor bathrooms for the duration of the Lease Term.

3.3    <u>Exclusive Use of Basement</u>:  Landlord grants to Tenant exclusive use of the Basement level for the duration of the Lease Term.  Tenant shall grant Landlord open access to Basement for any and all required repairs to the building systems upon receipt of written notice from Landlord.

### ARTICLE IV – Landlord Obligations

4.1    <u>Local Taxes and Fees</u>:  Landlord shall be obligated to pay all local permit fees and taxes including but not limited to Conditional Use Permit fees, Certificate of Occupancy fees and L.A. City taxes.  Landlord shall make all payments in a timely manner and not create any further interruptions or interference with Tenant operations.

4.2    <u>Offset</u>:  In the event that Landlord does not make any repairs or pay any fees or taxes on the building, Tenant has the right to make such payments on behalf of Landlord.  Any payments made by Tenant on behalf of Landlord shall be reimbursed by Landlord within seven (7) calendar days of receipt of notice from Tenant that such payment has been made.  In the event Landlord does not reimburse Tenant any fees described in this provision within the proscribed time period, Tenant shall have the right to offset such amounts from the monthly rent.

Both Landlord and Tenant agree that all other terms and conditions of the Lease remain in effect throughout the term of the lease.

DATE: August 17, 2009

PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057

By: _____
    Kevin K. Choe
    President

DATE: August 17, 2009

HAWKEYE ENTERTAINMENT, LLC.
14242 Ventura Blvd #212
Sherman Oaks, CA 91423

By: _____
    Name:
    Title:

## EXHIBIT E

### SIGN CRITERIA

(A)    If applicable, Tenant shall be permitted to use the standard interior signage in the first floor lobby area with Landlord's prior approval.  Any such approved signage shall be professionally prepared and maintained in a neat manner, and shall comply with all applicable laws, ordinances and regulations.  Tenant shall have no right to paint or cover in any manner the exterior or interior of the windows or doors without Landlord's prior written consent.

(B)    Tenant shall not affix, place or set upon the exterior (or interior windows or doors) of the Premises or anywhere adjacent to the Premises or the Building any sign, advertising placard, advertising banners, self-standing signs, name, insignia, trademark, descriptive material or other like item (collectively, the "Exterior Signs"), unless the Exterior Signs comply with all governmental requirements and are approved by Landlord, which approval shall not be unreasonably withheld.

(C)    All of the Exterior Signs shall be erected by Tenant at its sole cost and expense, and installed and operational prior to the opening of the Tenant's business to the public.  Tenant shall maintain all of its Exterior Signs in good condition and repair during the Term.  Landlord shall have the right to reasonably change the Sign Criteria from time to time.  Tenant shall be subject to all such changes following written notice from Landlord to Tenant setting forth such changes.

(D)    Notwithstanding anything herein to the contrary, Tenant shall be entitled, at Tenant's sole cost and expense, to place a sign panel on a monument sign or pylon sign, if any existing now or which may be erected at the Building, in a position determined by Landlord if there is a space available thereon.  Nothing herein shall be construed as a representation that Landlord will install a monument or pylon sign or an obligation of Landlord to install such a sign.

(E)    Tenant, in designing, installing and maintaining the signs shall exercise the Tenant's utmost care and consideration to maintain the integrity and appearance of the Building to the general public.

## EXHIBIT A

### SITE PLAN

This Exhibit A indicates only (i) preliminary leasing concepts and (ii) layout, access, egress and design of the Premises.  It is subject to change and should not be relied upon as representing the identity, kind, size, design, location, use or opening date of any tenant, architectural or design features or space within the Building.  Further, the space number used in this Lease to designate the Premises is assigned for administrative reference purposes only and may be unilaterally changed at any time by written notice from Landlord to Tenant.  In the event of any change in the reference number, said change shall be deemed to be made everywhere in the Lease that reference is made to suite number or space labeling or numbering.

## EXHIBIT B

### LEGAL DESCRIPTION

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL 1:

THAT PORTION OF BLOCK 16 OF ORD'S SURVEY, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 53 PAGE 66 ET SEQ., OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF SPRING STREET AT ITS INTERSECTION WITH A LINE AS DESCRIBED IN PARTY WALL AGREEMENT RECORDED IN BOOK 528 PAGE 102 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING SOUTH 37 50' WEST 159.91FEET ALONG SAID EAST LINE OF SPRING STREET FROM THE SOUTHERLY LINE OF SIXTH STREET; THENCE ALONG THE LINE AS DESCRIBED IN SAID AGREEMENT SOUTH 52 19' 15" EAST 146.11 FEET TO THE WEST LINE OF HARLEM PLACE; THENCE ALONG HARLEM PLACE, SOUTH 43 48' 10" WEST, 79.95 FEET TO A POINT IN THE NORTH FACE OF THE NORTH WALL OF A SIX-STORY BUILDING DISTANT NORTH 43 48' 10" EAST, 180.34 FEET FROM AN ANGEL POINT IN THE WEST LINE OF SAID HARLEM PLACE; THENCE ALONG THE NORTH FACE OF SAID WALL, NORTH 52 26' 5" WEST 137.79 FEET TO A POINT IN THE EAST LINE OF SPRING STREET, DISTANT NORTH 37 50' EAST 349.65 FEET FROM THE NORTH LINE OF SEVENTH STREET, 80 FEET WIDE; THENCE ALONG SPRING STREET NORTH 37 50' EAST 70.96 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

A PERMANENT EASEMENT FOR ENCROACHMENT OF THE BASEMENT WALLS AND THE DOWNWARD CONTINUANCE THEREOF UPON THAT PORTION OF SAID PROPERTY PARTICULARYLY DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 9 IN BLOCK 16 OF ORD'S SURVEY, IN THE CITY OF LOS ANGELES, AS SHOWN ON MAP RECORDED IN BOOK 53 PAGES 66 AT SEQ., OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BOUNDED BY THE FOLLOWING DESCRIBED

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF SPRING STREET, 80 FEET WIDE, AS ESTABLISHED BY THE CITY ENGINEER OF SAID CITY AND SHOWN ON MAP M221 ON FILE IN THE OFFICE OF SAID CITY ENGINEER, DISTANT THEREON, SOUTH 37 50' 00" WEST, 159.91 FEET FROM THE SOUTHWESTERLY LINE OF SIXTH STREET, 60 FEET WIDE, AS SHOWN ON SAID MAP M221, SAID POINT ALSO BEING THE MOST WESTERLY CORNER OF THE LAND DESCRIBED IN DEED TO SIXTH AND SPRING CORPORATION, RECORDED AS DOCUMENT NO. 1680 ON FEBRUARY 28, 1958, IN BOOK D28 PAGE 736, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID SOUTHEASTERLY LINE OF SAID SPRING STREET, NORTH 37 50' 00: EAST, 60 OF A FOOT; THENCE AT RIGHT ANGLES, SOUTH 52 10' 00" EAST, 107.42 FEET; THENCE AT RIGHT ANGLES, NORTH 37 50' 00" EAST, 25 OF A FOOT; THENCE AT RIGHT ANGLES, SOUTH 52 10' 00" EAST, 38.76 FEET TO A POINT ON THE NORTHWESTERLY LINE, OF HARLEM PLACE, 20 FEET WIDE, AS SHOWN ON SAID MAP M221, SAID LINE ALOS BEING THE SOUTHEASTERLY LINE OF SAID LANDS DESCRIBED IN SAID DEED TO SIXTH AND SPRING CORPORATION, THENCE ALONG SAID LINE SOUTH 43 49' 00" WEST, 46 OF A FOOT TO THE MOST SOUTHERLY CORNER OF SAID LAND, THENCE ALONG THE SOUTHWESTERLY LINE OF SAID LAND, NORTH 52 19' 15" WEST, 146.13 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

A PERMANENT EASEMENT FOR ENCROACHMENT ABOVE GROUND UPON THAT PORTION OF SAID PROPERTY PARTICULARLY DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 9 IN BLOCK 16 OF ORD'S SURVEY, IN THE CITY OF LOS ANGELES, AS SHOWN ON MAP RECORDED IN BOOK 53 PAGES 66 AT SEQ. OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BOUNDED BY THE FOLLOWING DESCRIBED LINES:

BEGINNING AT A POINT IN THE SOUTHWESTERLY LINE OF SPRING STREET, 80 FEET WIDE, AS ESTABLISHED BY THE CITY ENGINEER OF SAID CITY AND SHOWN ON MAP M221 ON FILE IN THE OFFICE OF SAID CITY ENGINEER, DISTANT THEREON SOUTH 37 50' 00" WEST, 159.91 FEET FROM THE SOUTHWESTERLY LINE OF SIXTH STREET, 60 FEET WIDE, AS SHOWN ON SAID MAP M221; SAID POINT ALSO BEING THE MOST WESTERLY CORNER OF THE LAND DESCRIBED IN DEED TO SIXTH AND SPRING CORPORATION, RECORDED AS INSTRUMENT NO. 1680 ON FEBRUARY 28, 1958 IN BOOK D28 PAGE 736, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 52 19' 15" EAST, 24.00 FEET TO THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE CONTINUING SOUTH 52 19' 15" EAST 116.68 FEET TO A POINT DISTANT NORTH 52 19' 15" WEST, 5.45 FEET FROM THE NORTHWESTERLY LINE OF HARLEM PLACE, 20 FEET WIDE, AS SHOWN ON SAID MAP M221, SAID POINT ALSO BEING IN THE SOUTHEASTERLY LINE OF SAID LAND DESCRIBED IN SAID DEED TO SIXTH AND SPRING CORPORATION; THENCE AT RIGHT ANGELS FROM SAID LAST MENTIONED POINT, NORTH 37 40' 45" EAST, 20 OF A FOOT; THENCE NORTH 52 19' 03" WEST, 20.87 FEET; THENCE SOUTE 37 40' 45" WEST, 17 PF A FOOT; THENCE NORTH 52 20' 39" WEST, 95.81 FEET TO THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION.

APN: 5144-001-018

## EXHIBIT F

### RULES AND REGULATIONS

1. Tenant shall keep the Premises in a neat and clean condition, free from any objectionable noises, odors or nuisances, shall operate its business without unreasonable noise or vibration emanating from the Premises, and shall comply with all applicable health, safety and police laws, ordinances and regulations of any governmental authority having jurisdiction over the Premises or the Project; provided, however, the foregoing shall not be construed to require Tenant to perform any repairs which are the obligation of Landlord pursuant to this Lease.

2. Tenant shall, at its sole cost and expense, keep any Tenant's installation and/or pick-up areas adjacent to the Premises and permitted pursuant to the terms of this Lease in a neat and clean condition, and shall be responsible for removing from the Building any litter or debris resulting from Tenant's use of such installation and/or pick-up areas.

3. Tenant shall not sell merchandise from vending machines or allow any coin or token operated vending machine within the Premises, except those provided for the convenience of Tenant's employees. Any pay telephones provided for the convenience of Tenant's customers shall be located inside the Premises.

4. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be prohibited from attaching any handwritten or hand painted signs on the exterior of the Premises or within thirty-six (36) inches of any glass doors or show windows within the Premises.

5. Tenant shall deposit trash and rubbish only within receptacles approved by Landlord. Tenant shall cause trash receptacles to be emptied at Tenant's cost and expense; provided, however, at Landlord's option, Landlord may provide trash removal services, the cost of which shall be paid for by Tenant pursuant to an equitable proration of said costs by Landlord, in its sole discretion, among the then existing Tenants and their respective load of usage.

6. Tenant shall not display or sell merchandise or allow carts, signs or any other object to be stored or to remain outside the Premises. Tenant shall not erect any aerial or antenna on the roof, exterior walls or any other portion of the Premises. Tenant shall not solicit or distribute materials in the Common Area. Tenant shall neither conduct on the Premises, nor advertise with respect to the Premises, any liquidation, "going out of business," "distress," "lost our lease" or similar sale.

7. No advertising medium shall be utilized by Tenant which can be heard or seen outside the Premises including, without limitation, flashing lights, searchlights, loudspeakers, phonographs, radios or televisions; provided, however, Tenant shall be permitted to use music and video within the Premises as part of its merchandising so long as the volume of same is maintained at levels which do not cause disturbance of other tenants of the Building. Tenant shall not display, paint or place any handbill, bumper sticker or other advertising device on any vehicle parked in the Common Area. Tenant shall not distribute any handbills or other advertising matter in the Project.

8. Landlord, from time to time, may establish further reasonable and non-discriminatory rules and regulations for the Project, and Tenant shall abide by same provided that they neither materially increase Tenant's obligations nor materially diminish Tenant's rights under this Lease.



| GROUND FLOOR | |
|---|---|
| LOUNGE | 2,273 SF |
| WAITING AREA | 279 SF |
| OFFICE, SMALL | 397 SF |
| STORAGE #1 | 202 SF |
| STORAGE #2 | 269 SF |
| OFFICE, BIG | 1,821 SF |
| | 5,261 SF |





FOURTH FLOOR 3,559 SF

